**MULLINIX et al. v. HUBBARD et al.**

(Circuit Court of Appeals, Eighth Circuit. May 27, 1925.)

No. 6809.

1. **Gaming ⟷11 — Purchases and sales evidenced by brokers' signed slips are prima facie valid contracts.**

Purchases and sales on New York Cotton Exchange, through agency of brokers, evidenced by brokers' signed slips, are prima facie valid contracts.

2. **Gaming ⟷14—To be illegal, intent to settle differences between prices must be mutual between broker and customer.**

To be illegal as gaming transaction, customer and broker must both intend, when purchase and sale is made, that there shall be no delivery, nor lawful settlement before delivery, but merely settlement of price differences when delivery becomes due.

3. **Gaming ⟷49(1)—Transactions on Boards of Trade presumed valid, and must be proved invalid.**

Transactions on Boards of Trade, where cotton, grain, and other commodities are bought and sold, are presumptively lawful and binding, and burden is on those challenging them as unlawful, as wagers, to establish such fact.

4. **Gaming ⟷36—If transaction in futures is valid, broker is customer's agent; but, if transaction is wager, both are principals.**

If transaction in futures through broker is valid, broker is customer's agent; but, if transaction is illegal wager, both are principals.

5. **Gaming ⟷36—Contractual relations, expressed by parties, cannot be changed by law, without intention and consent of parties.**

Contractual relations between broker and customer, as expressed by parties, cannot be changed by law, without parties' consent and intention.

6. **Gaming ⟷12—Contracts for future deliveries are not illegal, because of customer's intention to settle in lawful and customary method before delivery date.**

That no deliveries were made under contract calling for future deliveries, but contracts were closed out by lawful and customary methods permitted by rules of New York Cotton Exchange and United States Cotton Futures Act (Comp. St. §§ 6309a–6309v), and that customer intended to close them out in such manner when he made contracts, did not make contracts illegal as wagering contracts.

7. **Gaming ⟷12—Contract for future deliveries, if lawful in its inception, does not become unlawful on change in relation of parties.**

If contract calling for future delivery is valid in its inception, it does not become unlawful because of subsequent change in relation or intention of parties.

8. **Gaming ⟷2—Legality of orders for future deliveries to be executed in New York determined by laws of New York, where they are legal.**

Legality of orders calling for future deliveries, given by resident of Arkansas personally or by telephone to Tennessee agent of New York brokers, to be executed on New York Cotton Exchange, is governed by laws of New York, where they are valid, and Acts Ark. 1907, p. 388, prohibiting dealing in futures, and making such transactions misdemeanors, is not applicable.

Appeal from the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Suit by Samuel T. Hubbard and others against F. C. Mullinix, as trustee in bankruptcy of Guy F. Bryant, bankrupt, and others. Decree for plaintiffs, and defendants appeal. Affirmed.

Robert E. Fuhr and Arthur L. Adams, both of Jonesboro, Ark. (H. M. Cooley, of Jonesboro, Ark., on the brief), for appellants.

Henry Craft, of Memphis, Tenn., for appellees.

Before LEWIS, Circuit Judge, and VAN VALKENBURGH and FARIS, District Judges.

LEWIS, Circuit Judge. This is an appeal from a decree foreclosing a mortgage on lands in Arkansas. Appellant Mullinix is trustee of the bankrupt estate of the mortgagor. Appellant J. T. Fargason Co. is also mortgagee, though subsequent in lien to appellees' mortgage. The defense made below and relied on here by appellants is that the indebtedness of the bankrupt, Guy F.

Bryant, which his mortgage to appellees purported to secure, is a gambling debt incurred by him in dealing in · cotton, and cannot be recovered. The transactions out of which Bryant's indebtedness to Hubbard Bros. & Co. arose consisted in the purchase and sale of cotton on the New York Cotton Exchange for future deliveries, made in full compliance with the rules and regulations of the exchange and United States Cotton Futures Act (Comp. St. §§ 6309a–6309v). Hubbard Bros. & Co. were and had been for many years members of the exchange, acting as brokers for customers, and they made the purchases and sales for Bryant on telegraphic orders from their branch office at Memphis, in compliance with Bryant's request, and each purchase and sale as made was at once reported to Bryant. No cotton was delivered or received, but the transactions were all closed out in keeping with the rules and regulations of the exchange, resulting in losses to Bryant, which appellees had to pay, and these, with the broker's usual commissions, made up the amount of the mortgage debt.

The principles of law to be applied to such transactions have become firmly settled by repeated decisions of the Supreme Court and this court. Irwin v. Williar, 110 U. S. 499, 4 S. Ct. 160, 28 L. Ed. 225; Embrey v. Jemison, 131 U. S. 336, 9 S. Ct. 776, 33 L. Ed. 172; Bibb v. Allen, 149 U. S. 481, 13 S. Ct. 950, 37· L. Ed. 819; Clews v. Jamieson, 182 U. S. 461, 21 S. Ct. 845, 45 L. Ed. 1183; Board of Trade v. Christie Grain Co., 198 U. S. 236, 25 S. Ct. 637, 49 L. Ed. 1031; Ponder v. Jerome Hill Cotton Co., 100 F. 373, 40 C. C. A. 416; Cleage v. Laidley, 149 F. 346, ·79 C. C. A. 284; Wilhite v. Houston, 200 F. 390, 118 C. C. A. 542; Gettys v. Newburger (C. C. A.) 272 F. 209; Browne v. Thorn (C. C. A.) 272 F. 950; Id., 260 U. S. 137, 43 S. Ct. 36, 67 L. Ed. 171; Lamson v. Turner (C. C. A.) 277 F. 680; Bond v. Hume, 243 U. S. 15, 37 S. Ct. 366, 61 L. Ed. 565.

[1] The New York Cotton Exchange affords opportunity to buy and sell ·cotton for future delivery, and when the business there carried on is conducted in accordance with its rules and regulations there is legitimate aid and not obstruction to commerce. When a purchase or sale is made it can only be made by members of the exchange, called brokers, from one to the other as principals to the contract, and each is bound by security theretofore required and given to ·carry out the contract, unless before delivery date settlement is made in keeping with the requirements of the rules and regulations. These settlements and the way in which they may be made, to be within the law, are considered and stated in the cases referred to. But each broker, in making the contract, acted also as agent for his customer who gave the order to buy or sell. That was the manner in which the purchases and sales here involved were conducted. They were made in the usual and regular way by broker's signed slips and were prima facie valid· contracts. Bryant as customer gave the orders to appellees as his brokers, who filled them; no deliveries were made, they were all closed out before delivery dates, in ·compliance with the rules, regulations and legal requirements stated in Gettys v. Newburger, which rests on the principles announced in the cases that preceded it, all presenting transactions of the kind here. Bryant's losses first fell on appellees, which they were compelled to pay and did pay. This suit is for reimbursement.

[2] The right of A. to sell to B. for future delivery and to buy from C. for delivery to be made at the same time is not questioned, nor the right of all of them by mutual consent to provide before delivery is due that there shall be delivery only from C. to B., where the amount and quality of the commodity in both sales is the same. A step further, if B. should make a like sale to C., why delivery at all, an idle, useless and expensive performance? Set-offs of sales against purchases and payment of the differences if any in the prices agreed on is the sensible, practicable, legal and economic procedure. The number of like transactions may be indefinitely multiplied, but as they increase adjustment by mutual consent becomes impossible without centralized agencies and a common clearing house. This and other lawful methods of adjusting and settling such transactions is the service that exchanges· and their memberships render, and we find no reason to look upon them with suspicion with a view to discovering if possible some ground on which it might be said there was a secret purpose to merely gamble on the future price of the commodity, thus making them void. It is, of course,· plain that facilities thus extended for legitimate business may be abused, and customer and broker intend only a wager on price of the commodity at the time named for delivery. That supposable condition is hardly conceivable here as to the broker, inasmuch as he was bound by security deposited

beforehand and expulsion from the exchange to perform or adjust and settle within the law. However, to make sure of keeping transactions on the exchange within its lawful purpose the rule established in the cases supra is that if both customer and broker intended, when the purchases and sales were made, that there should be no delivery and no lawful settlement before delivery came due, but a wager whether the market would be above or below the named price on that day, it would be a gambling transaction and no recovery could be had. One cannot gamble with himself, a sinister intent must be mutual to render the formal contract void. In Irwin v. Williar, supra, an instruction to the jury was accepted as a correct statement of the law which in part read:

"A contract for the sale of personal property which the vendor does not own or possess, but expects to obtain by purchase or otherwise, is binding if an actual transfer of property is contemplated. A transaction which on its face is legitimate cannot be held void as a wagering contract by showing that one party only so understood and meant it to be. The proof must go further, and show that this understanding was mutual— that both parties so understood the transaction. If, however, at the time of entering into a contract for a sale of personal property for future delivery it be contemplated by both parties that at the time fixed for delivery the purchaser shall merely receive or pay the difference between the contract [price] and the market price, the transaction is a wager, and nothing more. It makes no difference that a bet or wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade."

This was reannounced in Bibb v. Allen, and followed in Gettys v. Newburger and Browne v. Thorn.

[3] Transactions on boards of trade where cotton, grain and other commodities are bought and sold are presumptively lawful and binding, and the burden is on those who challenge them as unlawful, and as being mere wagers, to establish that fact before the parties to them may be relieved from their obligations. The purchases and sales were made and closed out in New York and were all valid and lawful transactions under the laws of that State, and also under the laws of Tennessee, where Bryant first turned in his orders to buy and sell, and knew they were to be executed by the appellees as his brokers on the New York Cotton Exchange. Counsel for appellants do not deny liability if the case on its facts comes within and is to be regarded according to the rules repeatedly announced in the authorities cited; but they rely on an Arkansas statute (Act April 11, 1907 [Laws 1907, p. 388] which denounces as unlawful every sale or purchase of wheat, cotton, corn or other commodity when in fact it is not in good faith intended by the parties or either of them that an actual delivery of the article or thing purchased shall be made. This Act repealed and took the place of an Act of three sections approved March 30, 1883 (Laws 1883, p. ——), which, in its first section, declared:

"That the buying or selling or otherwise dealing in what is known as futures, either in cotton, grain or anything whatsoever, with a view to profit, is hereby declared to be gambling."

The second section made a violation of the first a criminal offense. The present Act (1907) is leveled at the same evil, though more extended, consisting of sixteen sections. Its first section expresses its general purpose, declaring it to be unlawful to engage in the business commonly called dealing in futures on margins. The second section reads thus:

"That every contract or agreement, whether or not in writing, whereby any person or corporation shall agree to buy, or sell and deliver, or sell with an agreement to deliver, any wheat, cotton, corn, or other commodity, stock, bond, or other security to any person or corporation, when in fact it is not in good faith intended by the parties, or either of them that an actual delivery of the article or thing shall be made, is hereby declared to be unlawful, whether made or to be performed wholly within this State or partly within and partly without this State; it being the intent of this Act to prohibit any or all contracts and agreements for the purchase or sale and delivery of any commodity or other thing of value on margin, commonly called dealing in futures, when the intention or understanding of the parties or either of them is to receive or pay the difference between the agreed price and the market price at the time of settlement, and any person violating the provisions of this section for each transaction shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in any sum not less than five hundred nor more than five thousand dollars, and that upon conviction for a sec-

ond offense, in addition to said fine, the defendant shall be imprisoned in the county jail not exceeding twelve months."

Following sections prohibit setting up the means and resorting to the methods within the State by which the prohibited transactions may be carried on. The twelfth section says:

" * * * It shall be unlawful to lease any office or place of business for the purpose of carrying on the business of dealing in futures, or what is commonly known as 'bucket shops.' * * * "

The eighth section says the "act shall not be so construed as to prevent or render unlawful the posting or publishing of market quotations or prices of commodities, stocks, bonds, and securities by any regularly organized commercial exchange or other bona fide trade organization in which no purchase or sale for future delivery on margin is permitted."

The general purpose of the two Acts is the same. In considering the first Act the Supreme Court of the State, in Fortenbury v. State, 47 Ark. 188, 1 S. W. 58, said the statute "* * * does not declare of what a dealing in future consists, and it does not draw the line between lawful contracts for the future delivery of commodities and gambling ventures. Certainly the Legislature did not intend to impose any restrictions upon the legitimate commerce, but only to destroy the parasite that infests it. Contracts for future delivery, if entered into in good faith and with an actual intention of fulfillment, are valid as any other species of contract. A farmer may sell and agree to deliver his wheat or his cotton for a stipulated price before it is harvested. Nay, one may sell goods to be delivered at a future day which he has not in actual or potential possession, but which he intends to go into the market and buy.

"But this is not what is commonly known as dealing in futures. This phrase has acquired the signification of a mere speculation upon chances, where the grain, cotton or stocks dealt in exist only in imagination and where no delivery is contemplated, but the parties expect to settle upon the difference in the market. When so limited by judicial interpretation, the statute is not inconsistent with public policy. It forbids and punishes wagering contracts; that is, contracts in which the parties stipulate that they shall gain or lose upon the happening of an uncertain event, in which they have no interest, except that arising from the possibility of such gain or loss."

It was further said:

"There was no conflict in the testimony. The plaintiff in error kept a 'bucket shop' in Little Rock. This term seems, from the explanations of the witnesses, to denote a place where wagers are made upon the fluctuations in the price of grain and other commodities."

The later statute came before the court for consideration in Huff v. State, 164 Ark. 211, 261 S. W. 654. In that case Huff received from one Carpenter, within Arkansas, $750 and an order to buy one hundred bales of cotton. Carpenter testified that it was never intended that the cotton should be delivered to him, and that evidence was undisputed. The court held that the statute had been violated and that Huff was subject to a penalty under its provisions. The court said:

"Under the principles of law announced in the cases above cited, the transaction proved in the present case is a gambling contract, and the defendant falls under the ban of the statute. The undisputed testimony shows that there was no intention to require actual delivery of the cotton on the part of the purchaser, who is the prosecuting witness. The test which the statute requires is the intention on the part of either party not to actually deliver the articles bought or sold for future delivery. It does not make any difference how explicit the language of the contract is, if in fact there is no intention on the part of either of the parties to deliver; but when the real understanding is that, at the stipulated date the losing party shall pay to the other the difference between the market price and the contract price, the transaction is a gambling contract, and unlawful under the statute."

And appellants contend that although all purchases and sales are prima facie lawful contracts when made, yet if Bryant did not intend to deliver or receive the cotton they were mere wagers, regardless of appellees' intentions on the subject; and hence the general rule requiring that both parties have the same sinister purpose no longer prevails in Arkansas under the statute and the construction thus given to it by the State Supreme Court.

[4, 5] Let it be conceded that this is true if the broker knows that his customer only intended to speculate in "what is commonly known as dealing in futures" and expected "to settle upon the difference in the market price." But suppose the broker had no knowledge of that intention and purpose on

the part of his customer, that it was undisclosed to the broker, who intended the making of a lawful contract,—what then; must the broker who acted in good faith bear the loss? The supreme court of Arkansas has not said so. In the Fortenbury Case under the old Act is recognized the principle that to constitute a wager that purpose and intention must be mutual; and mark the statement in the Huff Case under the new Act, "when the real understanding is that, at the stipulated date, the losing party shall pay to the other the difference between the market price and the contract price, the transaction is a gambling contract, and unlawful under the statute." There can be no understanding unless both parties know what it is about. Furthermore, the relations of broker to customer are entirely different in the two transactions. If a valid contract he is the customer's agent; if a wager he and the customer are principals. Huff v. State, supra, and cases there cited. Contractual relations as expressed by the parties cannot be changed by the law without the intention and consent of both. But be that as it may, it is settled by the cases cited that such transactions on a reputable board of trade are presumed to be lawful and not wagers, and he who challenges them has the burden of proof. For that purpose, appellants called Bryant as a witness. He testified that he had bought, sold and shipped cotton, that he had dealt in cotton on the New York Cotton Exchange in preceding years, and knew something of the rules of the exchange, that he understood that if his contracts matured he must deliver or receive the cotton, but that by selling these contracts he was relieved from that obligation, that it was his intention in every instance to sell the contract before delivery date, that if he did not sell the contract he was bound by its terms, and he knew that if he did not fulfill any of his contracts Hubbard Bros., or whoever might be his brokers in the transaction, would have to fulfill them for him. He did not testify that when he made any of the purchases or sales it was his intention to let the contracts mature and settle upon the difference in the market price. No other witness testified for appellants on that subject.

Samuel T. Hubbard, a member of the firm of Hubbard Bros. & Co., testified that each member of his firm was a member of the New York Cotton Exchange, that for thirty years his firm had carried on business on that exchange, that no one but a member of the exchange could do business there, that under the rules of the exchange contracts to buy and sell cotton for future delivery were made on the floor of the exchange between its members and in the names of the members, though the contracts were in fact for customers, that they kept an account with each customer in the customer's name, that they charged a commission for their services, that his firm was also a member of the New York Cotton Exchange Clearing House, to which only members of the Cotton Exchange were eligible, and all of his firm's trades were cleared through the clearing house in accordance with the rules and regulations of the exchange, that every trade, whether to buy or sell for future delivery, which was executed by his firm for the account of Bryant passed through the clearing house, that his firm was required to keep on deposit with the clearing house a certified check for such sum as it should designate as necessary to insure the carrying out of each and every contract which it had in the clearing house, that this sum was fixed each day and every other member was required to do the same thing, that all memberships in the exchange were held under its rules and regulations by the exchange as additional collateral security for the carrying out of the contracts of its members, that his firm carried five memberships all thus pledged, and that on each and every contract which his firm made for Bryant the firm and each member thereof was held responsible, that all contracts, whether to buy or sell, contemplated actual delivery and receipt, and that there never was a purchase or sale made by his firm for Bryant or any one else where actual delivery was not intended, that no contract to buy or sell was permitted under the rules of the exchange which did not contemplate actual delivery, that a member who should fail to deliver or receive cotton on the day fixed for such receipt or delivery by the terms of the contract would be expelled from the exchange, his deposit in the clearing house would be used to make good his contract and his membership sold for the same purpose, that his firm bought and sold the cotton specified in the orders executed for Bryant with the full intention of complying with the contracts as regards delivery or receipt of the cotton in every instance, that the amount claimed under the mortgage is made up entirely of money advanced for Bryant's account by Hubbard Bros. & Co. and commissions due the firm.

[6, 7] As already stated, there was no delivery on any of these contracts, but before delivery dates were due they were all closed out by the lawful, customary and generally prevailing methods permitted by the rules and regulations of the exchange and its clearing house, and Bryant's intention when he made his contracts that they should be closed out in that way did not render them wagering contracts. Gettys v. Newburger, supra. The statutory prohibition is aimed only at the inception of these transactions, if that be lawful no further legislative concern about the contracts and the relation of the parties is manifested. As said in the Fortenbury Case, "Certainly the Legislature did not intend to impose any restrictions upon the legitimate commerce but only to destroy the parasite that infects it."

[8] Bryant resided across the river from Memphis. He testified that some of his orders were given to appellees' agent when he was in Memphis and some were sent by him from his home in Arkansas over the telephone, and he perhaps received from time to time at his home notices from appellees that his orders had been filled. The later transactions he left to the judgment of appellees. This, it is said, shows that the contracts were made partly within the State of Arkansas. But he knew and intended that all purchases and sales were to be made for him by appellees on the New York Cotton Exchange, and their legality was governed by the laws of that State, where they were valid contracts. Smith v. Craig, 211 N. Y. 456, 105 N. E. 798, Ann. Cas. 1915B, 937; Wilhite v. Houston, supra; Lamson v. Turner, supra; Berry v. Chase, 146 F. 625, 77 C. C. A. 161; Bond v. Hume, supra. They were not made in whole or in part within the State of Arkansas, nor were they to be performed in whole or in part within that State; and we do not see how the statute relied on can have application to them. The relation of customer and broker and their respective rights where the broker has made a purchase in good faith, are stated in Smith v. Craig, supra, thus: The customer's "interest in the contract for the delivery of cotton at a particular price and time was a clearly defined and enforcible right held by the defendants [brokers] as collateral to their undertaking in his behalf and for his benefit. It would ripen into a technical pledge of the cotton and the parties should be treated as pledgor and pledgee the same as they are treated in the case of a contract for the purchase of stocks or bonds even during the interim between the contract of purchase and the actual delivery of such stocks and bonds."

In the Bond Case similar transactions to those involved here were under consideration. The broker sued his customer in Texas for losses sustained in purchase and sale of cotton for future deliveries made by the broker on the New York Cotton Exchange, and the defense was based on a local statute which made it criminal that either party to the transaction did not have the bona fide intention when the purchase and sale were made that there should be delivery and payment for the thing purchased. It was contended, as here, that the statute declared a public policy of the State against such transactions, and that recovery of the debt could not be had in contravention of that policy. But the court held that the contract was valid under the laws of the State where it was made and to be executed, that the State statute did not prohibit and make criminal all sales for future delivery but only those in which it was not the bona fide intention of one of the parties at the time the purchase or sale was made that the thing purchased or sold should be delivered,—and so here. The facts in that case did not bring it within the statute, it did not appear that the customer did not intend delivery, and it was held that recovery could be had for the losses. No opinion was expressed on the question whether a State could by such a statute set up a public policy in the face of settled principles which would prevent recovery on a contract valid under the laws of the State where made. To say the least, the comments of the court on that subject engender serious doubt whether defendant's contention would have been sustained had the facts brought the case within the local statute.

The trial court could not have entered the decree appealed from without finding that the mortgage debt was a lawful debt and not a gambling debt, and we think the record supports that conclusion.

Affirmed.