Thurman **BRIDGEMAN**, Plaintiff,

v.

**GATEWAY FORD TRUCK SALES** and
Ford Motor Credit Company,
Defendants.

No. LR-68-C-242.

United States District Court
E. D. Arkansas, W. D.

Feb. 19, 1969.

Edgar R. Thompson, of Thompson & Thompson, Little Rock, Ark., for plaintiff.

Griffin Smith, Little Rock, Ark., for defendants.

## Memorandum Opinion

HENLEY, Chief Judge.

This suit for a declaratory judgment, in which diversity jurisdiction is established, is now before the Court on defendants' motion for summary judgment. The motion has been submitted on the entire record in the case, informal memorandum briefs, and oral arguments. The parties are in agreement that there is no dispute as to controlling facts and that summary judgment for one side or the other is appropriate.

Plaintiff, Thurman Bridgeman, is a citizen of Arkansas. He is employed by Arkansas Transport Refrigeration and Produce as parts manager. As a sideline, plaintiff, through employees of his own, operates two trucks or tractor-trailers which haul permit exempt products in interstate commerce from Arkansas to points in other States.

Gateway Ford Truck Sales of Fort Worth, Texas, is a retail dealer in Ford trucks or tractors. Ford Motor Credit Co. is engaged in the business of financing credit purchases of motor vehicles manufactured by Ford Motor Co. and sold by Ford dealers. Both Gateway and Ford Credit Co. appear to be wholly owned subsidiaries of Ford Motor Co.

In 1967 plaintiff purchased two Ford tractors from Gateway; one purchase was made in July, the other was made in August. In order to obtain the new trucks plaintiff traded in two used trucks as down payments and financed with Ford Credit Co. the balances due on the new trucks. The transactions were evidenced by conditional sales contracts whereby title to the vehicles was retained by the seller, and the seller also retained the right to repossess the vehicles should plaintiff default in respect of the monthly payments which the contracts required him to make.

Plaintiff made a number of payments and then fell into default. Thereafter plaintiff commenced this suit for a declaratory judgment to the effect that the conditional sales contracts were usurious. It is the theory of the plaintiff that the question of usury is to be determined on the basis of Arkansas law. If plaintiff is correct in his theory, his obligations are void, and he can retain the trucks without making further payments to plaintiff. Ark.Constitution, Art. 19, § 13; Ark.Stats., Ann., §§ 68–602, 68–604, 68–608, and 68–609 et seq.; see Lyles v. Union Planters National Bank, 239 Ark. 738, 393 S.W.2d 867, and Huchingson v. Republic Finance Co., 236 Ark. 832, 370 S.W.2d 185, and earlier Arkansas cases cited in those two decisions.

Both defendants filed a joint answer which is quite short and which is in part as follows:

"* * * Defendants admit the execution of the contract but as defense thereto state that the transaction is governed completely by Texas law under which the contract is not usurious."

Defendants seek a judgment for the balance due on the contract at the time of hearing, and ask that the collateral described in the contracts be sold toward satisfaction of the judgment.

The motion for summary judgment alleges simply that there is no genuine issue as to any material fact and that defendants are entitled to judgment as a matter of law.

It has been stipulated that the contracts entered into by plaintiff would be usurious and void under Arkansas law. There is no stipulation as to the validity or invalidity of the contracts under Texas law; nor have the parties stipulated with respect to the effect of usury in Texas assuming that the contracts are usurious by the law of that State and that the question of usury should be de-

termined by reference to Texas law. The Court will have occasion to return to that point later.

Before undertaking to solve the conflict of laws problem presented by this record it will be necessary to describe the transactions involved in more detail. In doing so the Court will rely largely on the detailed statement of facts appearing in the letter brief of counsel for defendants filed in support of the motion for summary judgment, which statement counsel for plaintiff concedes to be substantially correct. However, the Court has read the depositions on file, and is not limiting itself entirely to the statement of counsel.

In the summer of 1967 it was known to one of plaintiff's drivers, Fry, that his employer was in the market for a new truck. Fry was acquainted with Craig McAdams of McAdams Ford Motor Sales in Weatherford, Texas, and advised him that plaintiff was a prospective customer. The McAdams concern did not handle the type of vehicle desired by plaintiff and referred the matter to the defendant, Gateway. Van Hall, the president of Gateway, contacted plaintiff in Little Rock by telephone; as a result of that conversation, an employee of Gateway flew to Little Rock to appraise the truck which plaintiff desired to use as a trade-in on the purchase of the new truck.

The appraisal was made and resulted in another telephone conversation between Hall and plaintiff, and the parties agreed in essence on the terms of the contract covering the first truck. Gateway did not have a unit in stock which satisfied plaintiff's specifications but was able to locate such a unit in North Carolina; it was procured by Gateway and driven to Fort Worth.

The contract, labelled "Texas Automobile Retail Instalment Contract," was prepared in Fort Worth. Since plaintiff was unable or professed to be unable to go to Fort Worth to sign it, Mr. Hall brought it to Little Rock where it was executed by plaintiff. Although Hall had full authority to execute the contract on behalf of Gateway and to bind his company thereby, he did not do so. When he got back to Fort Worth, the contract was executed on behalf of Gateway by one McPheeters, the business manager of Gateway, and was assigned to Ford Credit Co. The used truck to be traded in was delivered to Gateway in Fort Worth by one of plaintiff's drivers who took delivery of the new truck there.

The transaction above described is evidenced by a contract dated July 15, 1967. A similar transaction involving another new truck was consummated a month later and for practical purposes the same procedure was followed.

Both trucks were registered with the Arkansas State Revenue Department; Arkansas titles were issued, and those titles reflected the security interest of Ford Credit Co. The contracts provided that the monthly installments were to be paid at such places as might be designated by the seller. It does not appear that either Gateway or Ford Credit Co. ever affirmatively designated a place of payment; however, it appears that the payments made by plaintiff were made in Texas. Certainly, there is nothing to suggest that they were made in Arkansas.

As indicated, the trucks were acquired for use in plaintiff's sideline business, and they were so used, transporting commodities in interstate commerce. Plaintiff seems to have had a good deal of difficulty with the trucks; they were inoperational for substantial periods of time, and plaintiff did not derive the revenues which he expected to derive from their operation. However, those difficulties are not the basis of this suit; plaintiff relies exclusively upon his claim of usury.

■ In passing upon the controversy between the parties the Court is required to ascertain and apply the Arkansas law of conflict of laws, Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Leflar, American Conflicts Law, § 66, pp. 149 et seq., the same task which the Court had to perform fairly recently in another

usury case, National Surety Corporation v. Inland Properties, Inc. (Tanglewood Apartments, Inc. v. National Surety Corporation), E.D.Ark., 286 F.Supp. 173, 187–190. The Court said (p. 188 of 286 F.Supp.):

"In the fairly recent case of Credit Bureau Management Co. v. Huie, E.D. Ark., 254 F.Supp. 547, 554, this Court pointed out that in passing upon the validity of contracts in a context of conflict of laws the Supreme Court of Arkansas has applied a variety of rules and that there is a lack of complete consistency in the Arkansas cases. The Court then went on to cite Dr. Leflar's article in 18 Arkansas Law Review, supra, l. c. 140, in which that able conflicts scholar takes the view that in a case involving the validity of a contract and in which the Court has a legitimate choice of law, the Supreme Court of Arkansas will ordinarily make the choice which will uphold the contract unless to do so will involve enforcing an obligation which offends a strong public policy of the State, including its public policy against usury. The Court sees no occasion to dispute Leflar's appraisal of the Arkansas law in this area.

"While the Arkansas public policy against usury is a strong one, it is not so strong that the Supreme Court of Arkansas will invariably apply Arkansas law to strike down the contract even though the contract would be enforceable if another appropriate choice of law were made * * *."

The Court then proceeded to refer to Cooper v. Cherokee Village Development Co., Inc., 236 Ark. 37, 364 S.W.2d 158. In that case a loan, usurious under Arkansas law but free from usury under the law of New York, was consummated in New York; the obligation was payable there, and the parties stipulated that their rights would be governed by New York law. The Supreme Court of Arkansas upheld the obligation against a claim of usury.

In the later case of Huchingson v. Republic Finance Co., supra, however, the Arkansas Court applied the law of this State to strike down a contract as usurious, notwithstanding the fact that the note was payable in another State under the law of which the consequences of usury are less severe than those in Arkansas. In that case it was said that the public policy of Arkansas against usury is a "strong one."

In the still later case of Lyles v. Union Planters National Bank, supra, the facts were that Lyles, a citizen of Memphis, Tennessee, and a customer of the Union Planters National Bank of that City, purchased an automobile on credit in Arkansas from an Arkansas dealer; the contract stated that the monthly installments on the note were payable at the dealer's place of business in Arkansas; the note was sold to the Bank, and the purchaser presumably actually made his payments to the Bank in Memphis. The contract was usurious under Arkansas law but not usurious under Tennessee law. In litigation between Lyles and the Bank the trial court applied Tennessee law and upheld the contract. The Supreme Court reversed. The holding of the Court was that in a usury context the validity of an obligation will usually be determined by the law of the place where the contract was made unless the parties have stipulated that its validity will be determined by the law of some other State having a reasonable connection with the transaction.

In Leflar, op. cit., § 153, the author states that in general courts in usury cases will try to make a choice of law that will uphold the contracts in controversy. But he says (p. 379):

"It must not be assumed that allegedly usurious contracts will never violate the strong public policy of the forum. Sometimes they will, if the transaction is a particularly 'raw' one. This can be true even in states that ordinarily go out of their way to discover a relevant law under which such contracts can be sustained. And it is also possible that policy attitudes toward the usury defense may change (there is some indication that this is

happening in the United States) so that judicial preferences could favor the law that would defeat usurious contracts * * *"

And the author notes that *Huchingson* and *Lyles,* supra, may indicate a hardening of the policy of the Arkansas Courts against usury. A still later case which may indicate a continuation of the trend that has been mentioned is Sosebee v. Boswell, 242 Ark. 396, 414 S.W.2d 380, cited by counsel for plaintiff. That case, however, did not involve any problem of conflict of laws and is not really helpful here.

In the Lyles case the Court cited without disapproval the earlier Cherokee Village case. There the Court pointed out that four different bases have been used in determining what law governs the validity of a contract, and that Arkansas has from time to time applied one or the other of the first three of them, namely: (1) the law of the State in which the contract is made; (2) the law of the State in which the contract is to be performed; (3) the law of the State which the parties intended to govern the contract, provided that that State has a substantial connection with the contract. (236 Ark. at 42–43, 364 S.W.2d 158.) With respect to the fourth basis which is that the governing law is that of the State having the most significant contacts with the matter in dispute, the Court said that Arkansas has not had occasion to employ that basis and found it unnecessary to do so in the case before it. (Ibid.)

As stated, *Cherokee Village* was not disapproved in *Lyles,* and the Court does not read *Lyles* as laying down an inflexible rule governing choice of law in usury cases.

The Court considers that the conflicts question presented by this record is a close one, and none of the relevant Arkansas decisions is directly in point. Such being the case, the Court is required to predict, as best it can, what the Supreme Court of Arkansas would hold were the question before it.

The transactions with which the Court is concerned had substantial connections with both Arkansas and Texas, and it would probably be permissible, logically and constitutionally, to choose either body of law as governing. After carefully considering and weighing the factors involved the Court concludes that the contracts were essentially Texas contracts, and that Arkansas law is not applicable.

To start with, the transactions had their genesis in Texas when Mr. Fry contacted Mr. McAdams in Weatherford, Texas, and advised him that plaintiff was in the market for a new truck. The later contact between McAdams and Hall led to the sale of the first truck, and the sale of the first truck led to the sale of the second truck.

The parties contemplated that the trucks would be delivered in Texas, and they were delivered in that State. It was also contemplated that the purchases would be financed in Texas; they were financed there, and plaintiff made his payments there.

Moreover, although the parties did not in so many words stipulate that the validity of the contracts would be determined by Texas law, the Court thinks that some significance is to be attached to the identification of the contract documents as being "Texas" automobile installment contracts.

The Court recognizes, of course, that plaintiff executed the contracts in Little Rock in the presence of Mr. Hall, that the latter had full power to bind his company by signing the documents on its behalf, and that the minds of the parties had essentially met on the terms and conditions of the contracts when plaintiff signed them. However, the Court also recognizes that the conduct of Hall in coming to Arkansas and obtaining the signature of plaintiff was not in the ordinary course of Gateway's business; that conduct was due solely to the fact that plaintiff pleaded that the press of his own employer's business prevented him from going to Fort Worth. And the Court recognizes that while Mr. Hall had

the authority to execute the contracts, he did not in fact do so. More than that, it appears to the Court that the transactions were not finally consummated until the contract documents had been finally accepted in Texas by Ford Credit Co.

The Court does not overlook the fact that Arkansas titles were issued by the Arkansas State Revenue Department but does not attach any great significance to that fact. Plaintiff resided in Arkansas, and the trucks were to be kept here while not on the road; hence, Arkansas registration was natural and convenient if not positively required. It has been pointed out that the trucks were not intended primarily for local use in Arkansas; they were to be used in making interstate hauls of commodities with Arkansas being simply their starting and terminal point.

■ The relief sought by plaintiff will be denied. That conclusion, however, does not dispose of the case in view of defendants' prayer for affirmative relief. It seems obvious to the Court that if the question of usury is not governed by Arkansas law, it must be governed by the law of Texas, and that the substantive rights of the parties must be determined by reference to the law of that State.

At the commencement of the argument the Court inquired of counsel as to what the Texas law of usury is. Counsel for plaintiff indicated that he was not interested in that question, and that he was standing on his contention that Arkansas law is applicable. Somewhat to the Court's surprise, counsel for the defendants also professed a lack of interest in Texas law, and, indeed, argued that the Court could not take judicial notice of the law of that State, that there was no evidence as to the law of Texas, and that the Court may not properly undertake to make ultimate disposition of the case on the basis of Texas law. However, counsel did not abandon his claim for affirmative relief; he not only wants to have the complaint dismissed, he also wants the Court to order plaintiff to surrender to defendants the certificates of title covering the vehicles in suit.

■ In view of the positions taken by both sides, the Court will confess that it is tempted simply to leave the parties where it finds them; that is to say, to dismiss the complaint but leave the vehicles and the title certificates in the possession of plaintiff. Such a course, however, would probably produce nothing but further litigation. Moreover, that is not the proper way to dispose of this lawsuit. Regardless of the theories of the parties, this Court is bound to apply the appropriate law to the issues raised by the pleadings. United States v. Latrobe Construction Co., 8 Cir., 246 F.2d 357, 361–362. The defendants in this case had a right to seek affirmative relief, and they are entitled to affirmative relief but only to the extent permitted by the correct body of governing law.

■■ Since this is a diversity case this Court, which in such an action amounts to another court of the State of Arkansas, has the same power to determine foreign law as is possessed by the Supreme Court of Arkansas and the lower Arkansas courts. A question of foreign law has been considered historically as being a question of fact. Such a fact may be proved by the testimony of persons learned in the law of the foreign jurisdiction, but it is not required to be established in that manner.

Prior to the adoption by Arkansas in 1961 of the Uniform Interstate and International Procedure Act, Ark.Stats., Ann., § 27–2501 et seq., Arkansas Act 98 of 1901, Ark.Stats., Ann., § 28–109, provided in express terms that the Courts of this State "shall take judicial knowledge of the laws of other States." And in a number of cases the Supreme Court of Arkansas has taken judicial notice of the laws of other States. See e. g.: Rumph v. Lester Land Co., 205 Ark. 1147, 172 S.W.2d 916; Great American Insurance Co. v. Stevens, 178 Ark. 84, 10 S.W.2d 356; Virgil R. Cross Mortgage Co. v. Jordan, 167 Ark. 34, 267 S.W. 590; Logan v. Missouri Valley Bridge and Iron Co., 157 Ark. 528, 249 S.W. 21. Specific attention is called to Virgil R. Cross Mortgage Co. v. Jordan, supra, 167 Ark.

at 38, 267 S.W. 590, wherein the Court stated specifically that the Arkansas Courts take judicial notice of the usury laws of Oklahoma and of the penalty for usury imposed by those laws.

Section 3 of the Uniform Interstate and International Procedure Act, Ark. Stats., Ann., § 27–2504, which deals with determination of foreign law does not speak in terms of "judicial notice" or "judicial knowledge." However, at least as far as this case is concerned, it did not change the substance of the former rule, assuming that section 3 of the Uniform Act repealed section 28–109. Section 3 of the Uniform Act is as follows:

> "*Determination of foreign law.*—A. Notice. A party who intends to raise an issue concerning the law of any jurisdiction or governmental unit thereof outside this State shall give notice in his pleadings or other reasonable written notice.

> "B. Materials to be considered. In determining the law of any jurisdiction or governmental unit thereof outside this State, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the rules of evidence.

> "C. Court decision and review. The court, not the jury, shall determine the law of any jurisdiction or governmental unit thereof outside this State. Its determination is subject to review on appeal as a ruling on a question of law."

■ With regard to subdivision A of section 3, the answer filed by the defendants specifically referred to Texas law as being applicable here and specifically alleged that the contracts in suit are not usurious under Texas law. In this Court's opinion those allegations in the answer were clearly sufficient to satisfy the notice requirements of section 3.

As to subdivision B and subdivision C, it is clear that under those subdivisions the Court has the power to make the determination of foreign law by reference to any appropriate materials; and the Court has made its determination in this case by consideration of materials which it considers appropriate and to which reference presently will be made.

■ In Texas, like Arkansas, the maximum legal rate of interest is 10 percent per annum, but the effect of usury in Texas is much less drastic than it is in Arkansas. Under Texas law a usurious contract is void as to interest but not as to principal. Further, a debtor in Texas may by affirmative claim secure credit on principal for interest payments made on a usurious obligation, but he does not obtain such credit automatically. Vernon's Annotated Civil Statutes of Texas, art. 5071; Abel v. Brayton Flying Service, 5 Cir., 248 F.2d 713; Texas Land & Mortgage Co. v. Mullican, 5 Cir., 132 F.2d 241; Rutland Savings Bank v. Wilson, 5 Cir., 108 F.2d 92.[1]

The text of article 5071 of the Texas Statutes is set forth in a footnote to the opinion of the Court of Appeals in Abel v. Brayton Flying Service, supra, 248 F.2d at 714, f. n. 2:

> "The parties to any written contract may agree to and stipulate for any rate of interest not exceeding ten per cent per annum on the amount of the contract; and all written contracts whatsoever, which may in any way, directly or indirectly, provide for a greater rate of interest shall be void and of no effect for the amount or value of the interest only; but the principal sum of money or value of the contract may be received and recovered."

In Texas Land & Mortgage Co. v. Mullican, supra, 132 F.2d at 242, the Court said:

> "Under Texas law, if the taxes that might be lawfully levied and charged to the debtor under the tax clause of

---

[1] The Fifth Circuit cases above cited declared and applied Texas law and are supported by adequate citations of Texas authority.

the deed of trust, plus the stipulated interest, aggregate more than ten per cent per annum on the indebtedness, the contract is usurious and void as to interest. Art. 5071, Texas R.S.; Travelers Ins. Co. v. Rowley, 133 Tex. 372, 128 S.W.2d 20; Robertson v. Connecticut General Life Ins. Co., 134 Tex. 588, 137 S.W.2d 760; Cole v. Franklin Life Ins. Co., 5 Cir., 108 F.2d 130; John Hancock Mut. Life Ins. Co. v. Davis, Tex.Civ.App., 163 S.W.2d 433. If the contract is void as to interest because of usury, the amounts paid on account of interest may properly be credited to discharge the principal amount of the debt. Atwood v. Deming Inv. Co., 5 Cir., 55 F.2d 180, 183; 42 Tex.Jur. Usury § 55, p. 949.''

As to the interest rate involved in this case the parties are in agreement "that the amount of interest produced by each contract exceeds the amount permissible under Arkansas law." [2] If the amount of interest exceeds the amount collectible under Arkansas law, then it exceeds 10 percent per annum, and the contracts are usurious under both Texas and Arkansas law.

█ It follows that the defendants are entitled to judgment under Texas law for the principal amounts of the respective obligations but are not entitled to collect any additional interest. Indeed, had counsel for plaintiff elected to amend his complaint so as to invoke, in the alternative, any provisions of Texas law which might turn out to be beneficial to plaintiff, plaintiff would have been entitled to credit on principal for the interest already paid by him. However, counsel stated specifically that he did not desire to amend in any respect, and he is not entitled to automatic credit on principal for interest payments made by him. Rutland Savings Bank v. Wilson, supra.

A judgment will be entered dismissing plaintiff's complaint and awarding to the defendants the principal amount now due

on each contract but without interest, together with the costs of the action. The judgment should provide that if it be not paid within two weeks from date of rendition the trucks are to be advertised and sold to satisfy the judgment insofar as possible, and in the event of sale plaintiff will be required to turn the title certificates covering the vehicles over to the officer making the sale or to the purchaser or purchasers at the sale.

Counsel for the defendants may prepare and submit a formal precedent for judgment after securing opposing counsel's approval as to form and computation.

---

2. From defendants' letter brief, dated December 20, 1968, which brief appears as part of the official file. As stated,

counsel for plaintiff has agreed that the statements of fact appearing in the letter brief are substantially correct.