In re Murray F. ARMSTRONG.

William S. Meeks, Trustee, plaintiff,

v.

Red River Entertainment of Shreveport, Partnership in Commendam d/b/a Harrah's Shreveport Casino, defendant.

Bankruptcy No. 96–50087 S.
Adversary No. 97–5003.

United States Bankruptcy Court,
E.D. Arkansas,
Pine Bluff Division.

Feb. 1, 1999.

Thomas Streetman, Crossett, AR, for plaintiff.

Richard Ramsey, for defendant.

### AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARY D. SCOTT, Bankruptcy Judge.

THIS CAUSE is before the Court upon the trial of the Complaint to Recover Money or Property. The trustee seeks to recover funds from a casino under Bankruptcy Code sections 548(a)(1), (a)(2), 547, 544(b) and Ark. Code section 16–118–103. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 157(b)(2)(F), (H), (O). The debtor in this case, Murray Armstrong, is an attorney who organized Ponzi schemes[1] and embezzled massive amounts of funds from his clients to support his snowballing Ponzi schemes and gambling debts. He is now incarcerated for his crimes.

In 1990 Armstrong began experiencing financial difficulties. In order to rectify his problems, he began operating a Ponzi scheme based upon a non-existent timber contract. As is the nature of Ponzi schemes, his financial difficulties were exacerbated rather than rectified. In an effort to support the snowballing debts arising from his scheme he borrowed money, and, in 1994, began gambling in hopes of winning enough money to fund the collapsing Ponzi scheme. Check kiting also became a means of supporting his new way of life. In the final days of his financial collapse Armstrong also defrauded elderly clients of their life savings. When one of his schemes was finally exposed, they all collapsed. On January 30, 1996, an involuntary bankruptcy petition was filed. An order for relief was entered on March 13, 1996.

The defendant operates Harrah's Shreveport Casino ("Harrah's") in Shreveport, Louisiana. Harrah's is licensed and operates under the laws and regulations of the state of Louisiana. In or around 1995 Armstrong began gambling at Harrah's. He patronized the casino prior to May 1995 to establish a track record of gambling. On or about May 5, 1995, Armstrong applied for and was granted the ability to utilize markers. A marker is an advance or loan which may be exchanged for cash or chips in order to gamble.[2] *See United States v. Abodeely*, 801

---

1. Ponzi schemes are schemes in which returns to investors are financed through funds from new investors rather than through the success of the underlying business venture. *See generally In re Hedged–Investments Assoc.*, 48 F.3d 470 (10th Cir.1995).

2. Harrah's characterizes the use of markers as a negotiable instrument used in the gaming indus-

F.2d 1020, 1022 (8th Cir.1986). Prior to permitting a patron to utilize the marker system, however, it investigates the patron's financial background, including whether the patron frequents other gaming establishments, and whether markers or checks issued at those facilities are paid. Harrah's obtains a credit report as well as information from the designated bank. Harrah's general policy is to hold markers for seven days and up to thirty days, as permitted under Louisiana gaming regulations. Since the initial markers issued to Armstrong were returned paid in approximately ten days, the seven day policy was initially applied to Armstrong. By the end of August 1995, the casino was holding the markers for two or more weeks.

Armstrong was permitted to present markers payable to Harrah's by the Bank of Rison. Harrah's investigation of Armstrong revealed that he was gaming at other facilities and that his checks were honored. Armstrong patronized Harrah's six times after his credit was approved. After the August ¹¹/₂₃, 1995, trip, Harrah's realized that Armstrong was in "over his head" and, after the markers were returned unpaid from a August 25, 1995, trip, Harrah's suspended his credit line. In late September 1995, Armstrong delivered payments of $19,000 and $9,000 to cover the markers returned for insufficient funds.

It is uncontroverted that during the one year period prior to January 30, 1996, when the involuntary bankruptcy case was filed, Armstrong customarily and regularly bet large sums of money at Harrah's, losing approximately $377,000 at the casino. The evidence was overwhelming that, in this one year period, the debtor was hopelessly insolvent. Further, it is clear that Armstrong was insolvent for at least several years prior to the filing of this bankruptcy case.

## I. *SECTION 548(a)(1): ACTUAL FRAUD*

### A. *The Trustee's Causes of Action*

Counts I and II of the trustee's complaint state causes of action for actual fraud, seeking recovery of $284,000 and $93,000 expended at Harrah's in the year prior to bankruptcy under section 548(a)(1) of the Bankruptcy Code.

■ Under Section 548(a)(1) of the Bankruptcy Code, the trustee may recover any transfer of an interest in property of the debtor, or an obligation incurred by the debtor, if the debtor made the transfer or incurred the obligation with the actual intent to hinder, delay, or defraud any entity. *See generally Brown v. Third National Bank (In re Sherman),* 67 F.3d 1348 (8th Cir.1995). This statute is broad, not requiring by its terms that the fraud be directed at any particular entity. The section merely requires that an interest in property of the debtor be transferred and that the debtor made the transfer with fraudulent intent. Fraud or bad faith on the part of the recipient of the transferred interest is not an element of proof. Of course, proof of fraud by direct evidence is rare, such that the court must generally infer fraud from the circumstances of the transfer. *Id.* at 1353.

**Transfer of an interest of the debtor.** Armstrong obtained funds through numerous fraudulent methods, including his Ponzi schemes, check kiting, and embezzlement from his clients. These funds were deposited into his various accounts at local banks. It was usually from these accounts—and with regard to Harrah's, at the Bank of Rison—that he wrote checks to Harrah's thereby passing title to the funds. *See Mossler Acceptance Co. v. Johnson,* 109 F.Supp. 157, 168 (W.D.Ark.1952) (title can be transferred to *bona fide* purchaser).

■ **Transfer made with actual intent to defraud.** Armstrong knew that he could not pay his snowballing debts. Although he testified that, while actually gambling, he did not contemplate where he could obtain the funds to cover the checks he had written, he also testified that the consideration arose in

---

try whereby a patron buys chips in return for the marker drawn on a designated bank. Harrah's analogizes the use of markers to the use of checks used to purchase goods at any other retail outlet as the markers are payable upon execution

and Harrah's may deposit them immediately for payment from the patron's bank. This characterization is belied, however, by the fact that they essentially require a credit application before markers are used.

his mind the next day. Although he may have been "driven" to gamble and to obtain funds to cover his illegal schemes, in fact he knew at the time he placed the bets that he could not *win* sufficient funds to cover his gambling losses and Ponzi schemes.

Although it is true that a debtor's "honest but somewhat questionable belief that he would soon get lucky at gambling and pay off his debts" can defeat a finding of the requisite scienter, *AT & T Universal Card Services v. Alvi*, 191 B.R. 724, 734 n. 19 (Bankr. N.D.Ill.1996), Armstrong did not hold such a belief. There is no evidence that he was a gambling addict, which may require analysis under a more subjective approach. *Cf. AT & T Universal Card Services v. Crutcher (In re Crutcher)*, 215 B.R. 696 (Bankr.W.D.Tenn. 1997). He was desperate, but not a fool.

Armstrong is a well educated and articulate man who deliberately ventured on a path of fraud and deception, heedlessly gambling the funds obtained through fraud. He did not care where the money came from and therefore deliberately defrauded friends, business associates, clients and neighbors. He readily admitted that he gambled—made the transfers to Harrah's—in order to support the schemes. He not only had the requisite fraudulent intent in obtaining the funds, but also in transferring them to Harrah's because the transfers were made in the pursuit of his efforts to maintain his various fraudulent schemes.

Further, he knew when he made the transfers that the effect would be to "hinder, delay, or defraud" numerous persons. He knew he could not continue to financially support the schemes because he did not have the assets or means to obtain funds to pay the debts he was incurring. He was writing checks against which he did not have funds on deposit. Accordingly, when making the transfers to Harrah's, Armstrong had the actual intent to hinder, delay, or defraud any entity within the meaning of section 548(a)(1). *Cf. Karelin v. Bank of American (In re Karelin)*, 109 B.R. 943 (9th Cir. BAP 1990) (use to which borrowed funds put, knowledge of hopelessness of repaying through gambling, extent of assets and business experience evidenced fraudulent intent

under section 523(a)); *American Express Travel Related Services Co. v. Nahas*, 181 B.R. 930 (Bankr.S.D.Ind.1994) (debt nondischargeable where debtor was gambling at level well above what he could ever hope to repay); *Chemical Bank v. Clagg*, 150 B.R. 697 (Bankr.C.D.Ill.1993).

### B. *The Casino's Defenses*

In light of the breadth of the cause of action under section 548(a)(1), as well as the parallel Arkansas statute, the Bankruptcy Code and Arkansas law provide the transferee with a defense of good faith:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c). *Accord* Ark.Code Ann. §§ 4–59–208(a), (d), 4–59–203(a). Thus, a defendant may retain the funds transferred if it can prove that the transfer was made (1) for value and (2) in good faith. Of course, the recipient may retain the funds only to the extent of the value given.

**Value for the Transfer.** The trustee asserts that value does not exist because the debts are unenforceable under Arkansas law since Arkansas has a strong policy against gambling activities. Harrah's asserts that it gave value in the form of cash in exchange for the check Armstrong tendered to Harrah's. The Court finds that value was in fact given through the extension of credit and funds to gamble.

It is a fundamental principle of United States law that the laws of another jurisdiction are valid and enforceable in any state which can obtain jurisdiction over the defendant, provided it is not against the public policy of the laws of the state in which it is sought to be enforced. *Cf. Mullinix v. Hubbard*, 6 F.2d 109 (8th Cir.1925). State policies against gaming and wagering are, in the majority of cases, used to preclude enforce-

ment of claims based upon gambling debts. *See, e.g., Carnival Leisure Industries v. Aubin,* 938 F.2d 624 (5th Cir.1991). However, the Eighth Circuit has held, in an Arkansas case, that such policies do *not* preclude enforcement of what Arkansas considered to be a gambling contract where that contract was valid and legal in the place of contracting. *Mullinix v. Hubbard,* 6 F.2d 109 (8th Cir. 1925). In contrast, the trustee cites authority in which the debts related to unregulated gambling. For example, in *Singley v. Norman,* 202 Ark. 532, 150 S.W.2d 947 (1941), the Arkansas Supreme Court refused to enforce a gambling debt because the purpose for the loan was unlawful. In *Singley,* the loan was given for the express purpose of betting on an unlawful, unregulated dice game. Since the intent of the parties was to enable the other to violate the law, the contract was corrupt, illegal and void. *Id.* At 949.

Arkansas does not have a policy against *regulated* gambling. Although Arkansas statutes contain numerous provisions prohibiting *unregulated* gaming, the purpose of which is to discourage such unregulated gambling, *Martin v. Wheatley,* 62 F.Supp. 104, 107 (W.D.Ark.1945), those laws and the underlying policies do not extend to regulated gambling. This is supported by the fact that Arkansas law sanctions regulated horse racing under the Arkansas Horse Racing Law, Ark.Code Ann. § 23–110–101, *et seq.,* and dog racing, under the Arkansas Greyhound Racing Law, Ark.Code Ann. § 23–111–101, *et seq.* Indeed, the legislature, in permitting gambling in Arkansas, has stated that horse racing "and activities related thereto in Arkansas have had a most significant favorable impact on the economy of the entire state and the welfare of our citizens and residents...." 1987 Ark. Acts, No. 440, § 8. The state not only allows horse and dog racing, it expressly permits regulated wagering on these activities. Ark.Code Ann. §§ 23–110–

405; 23–111–508. Further, although lotteries are not legal in Arkansas, it is not unlawful in the State of Arkansas to possess a lottery ticket issued in another state where a lottery is legal. Ark.Code Ann. § 5–66–118(a)(3). Thus, Arkansas not only permits gambling in certain regulated contexts, but also recognizes the opportunities to legally gamble in other states. Thus, there does not appear to be any Arkansas prohibition or policy against state sanctioned and regulated gambling in Arkansas or any other state. If Louisiana chooses to permit and regulate a certain type of gambling, Arkansas policies are not offended. Thus, Arkansas policies do not necessarily preclude application of Louisiana law [3] or enforcement of valid and legal gambling debts incurred in Louisiana. *Cf. Mullinix v. Hubbard,* 6 F.2d 109 (8th Cir. 1925). Accordingly, Arkansas policies against unregulated gambling cannot be used to obviate the existence of value.

 **Good Faith.** Good faith under this statute does not pertain to a lack of knowledge of the debtor's fraud. Rather, the inquiry is whether the transferee had knowledge of the debtor's insolvency. Good faith must be determined on a case by case basis using an objective standard of what the transferee knew or should have known. *Sherman,* 67 F.3d at 1355. The court is required to inquire into whether the recipient had inquiry notice of the debtor's insolvency and whether the transaction carried the earmarks of an arms-length bargain. *Id.* Although the trustee's arguments appear to urge a higher level of responsibility, a gambling casino has the same, but no greater, duty to investigate the information it receives on credit reports and otherwise, as any other creditor.

 The Court finds that, with regard to the particular transactions at issue, Harrah's did not have reason to know of Armstrong's

**3.** It appears that Louisiana law would apply to these debts, incurred in regulated gambling, as the markers were issued in Louisiana with the proviso that Louisiana law applied to them and the activities occurred in Louisiana. Arkansas' only connection is that it is the residence of the gambler and the location of the gambler's bank. *See generally Aetna Life Insurance Co. v. Great*

*National Corporation,* 818 F.2d 19, 20 (8th Cir. 1987); *Bridgeman v. Gateway Ford Truck Sales,* 296 F.Supp. 233 (E.D.Ark.1969), *amended,* 311 F.Supp. 695 (E.D.Ark.1970). *See also In re Leroux,* 216 B.R. 459 (Bankr.D.Mass.1997) (refusing to apply law of forum state in gambling context).

financial difficulties and insolvency. Armstrong established the privilege of utilizing markers at Harrah's in May 1995 and, during that time, patronized Harrah's only six times. It was not until September 13, 1995, after Armstrong's August 25, 1995, trip to Harrah's, that the markers were returned for insufficient funds. In response, Harrah's terminated Armstrong's ability to utilize any form of credit, including the markers at its casino.

While it is true that the snowballing effect of Armstrong's Ponzi schemes had a strong and ascertainable impact upon Armstrong's finances and financial transactions, those effects were not readily discernable until mid-to late 1995. During this time, Armstrong patronized several casinos, each of which extended large sums of credit to Armstrong. Indeed, each of the casinos had access to a Central Credit bureau especially for gambling establishments which informed each of them of the amounts of credit extended to Armstrong by each casino, current balances owed, and basic information on Armstrong's history of play. As late as in mid-October 1995, Armstrong still had large credit limits at Fitzgerald's Casino, Harrah's in Tunica, and Horseshoe and Hollywood Casinos, located in Robinsville and Tunica, although many of these limits were fully extended.

On August 23, 1995, the credit manager at Harrah's indicated Armstrong was in "over his head" and "strongly suggest[ed] no more increases." Harrah's canceled Armstrong's credit on September 13, 1995, and declined to renew it. Indeed, Harrah's appears to have been the first gambling institution to realize that there were possible problems with Armstrong's finances and, when Armstrong's markers were returned in August, Harrah's terminated Armstrong's ability to obtain markers. Until that time, Armstrong had paid all of his markers, and his checks consistently cleared. It was not until this time that it was sufficiently apparent that Armstrong was in "over his head." Since Armstrong's insolvency was not readily apparent until the time Harrah's terminated Armstrong's credit, Harrah's is protected by the good faith defense of section 548(c).

## II. *SECTION 548(a)(2): CONSTRUCTIVE FRAUD*

Under the constructive fraud provisions of the Bankruptcy Code, 11 U.S.C. § 548(a)(2), the trustee may avoid any transfer of an interest of the debtor in property if the debtor received less than reasonably equivalent value for the transfer and the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. Under Count III, the trustee seeks to avoid transfers in the amount of $93,600 in gambling debts under to this provision.

The trustee asserts that reasonably equivalent value does not exist because, not only were the gambling debts unenforceable under Arkansas law, but also because the debtor could have sued the casino to recover those losses incurred within ninety days of the bankruptcy. *See* Ark.Code Ann. § 16–118–103. Thus, the trustee argues, reasonably equivalent value cannot exist.

It is a fundamental principle of United States law that the laws of another jurisdiction are valid and enforceable in any state which can obtain jurisdiction over the defendant, provided it is not against the public policy of the laws of the state in which it is sought to be enforced. *Cf. Mullinix v. Hubbard*, 6 F.2d 109 (8th Cir.1925). State policies against gaming and wagering are, in the majority of cases, used to preclude enforcement of claims based upon gambling debts. *See, e.g., Carnival Leisure Industries v. Aubin*, 938 F.2d 624 (5th Cir.1991). However, the Eighth Circuit has held, in an Arkansas case, that such policies do *not* preclude enforcement of what Arkansas considered to be a gambling contract where that contract was valid and legal in the place of contracting. *Mullinix v. Hubbard*, 6 F.2d 109 (8th Cir. 1925).

Second, as discussed above, although the State of Arkansas seeks to discourage unregulated gambling, Arkansas' policies against gaming, do not extend to regulated gambling. Since Arkansas policies do not necessarily preclude application of Louisiana law or enforcement of valid and legal gambling debts incurred in Louisiana, Arkansas policies

against unregulated gambling cannot be used to negate reasonably equivalent value.

Harrah's asserts that reasonably equivalent value exists such that recovery must be denied under the rationale of *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769 (6th Cir.1995), *cert. denied*, 517 U.S. 1168, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996). In *Chomakos*, the Sixth Circuit Court of Appeals held that reasonably equivalent value exists for a wager when a bet is placed. The Sixth Circuit reasoned that, since gambling is legal, when a bet is placed, legally enforceable contract rights arise. Those contract rights are property. The placing of the bet, therefore, is the transfer of property. The subsequent depreciation or appreciation of the value of the wager (*i.e.*, winning or losing) does not change reasonably equivalent value since the focus is the actual time of the wager, not the result. At that time no one can know whether the bet will have a successful outcome. Hence, like an investment in a commodities future, it has economic value.

This court, following *Chomakos*, finds that reasonably equivalent value exists with regard to the transfers such that recovery under count III stating a theory of constructive fraud, must be denied. *See also Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458 (4th Cir.1990); *Samson v. U.S. West Communications, Inc. (In re Grigonis)*, 208 B.R. 950 (Bankr.D.Mont.1997).

### III. *CONCLUSION*

Although Armstrong's activities constituted fraud and the transfers would otherwise be avoidable under section 548(a)(1), Harrah's demonstrated that it gave value for the monies paid by Armstrong and that it acted in good faith within the meaning of section 548(a)(1). Moreover, since reasonably equivalent value was given in the transactions, constructive fraud under section 548(a)(2) does not exist. Accordingly, the defendant is entitled to dismissal of the complaint.

**IT IS SO ORDERED.**