**In re Murray F. ARMSTRONG.**

**William S. MEEKS, Trustee, Plaintiff,**

**v.**

**GREENVILLE CASINO PARTNERS, L.P., Defendant.**

**Bankruptcy No. 96–50087 S.**
**Adversary No. 96–5056.**

United States Bankruptcy Court,
E.D. Arkansas,
Pine Bluff Division.

Feb. 20, 1998.

Order Denying in Part Granting,
In Part Motion to Amend,
March 4, 1998.

Thomas Streetman, Arnold Hamilton & Streetman, Crossett, AR, for Plaintiff.

Scott T. Vaughn, Little Rock, AR, for Defendant.

William Meeks, Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARY D. SCOTT, Bankruptcy Judge.

THIS CAUSE is before the Court upon the trial of the Second Amended Complaint. The trustee seeks to recover funds from a casino under Bankruptcy Code sections 548(a)(1), (a)(2), 547, 544(b) and Ark.Code section 16–118–103. The Court has jurisdic-

tion over this action pursuant to 28 U.S.C. § 157(b)(2)(F), (H), (O).

Murray Armstrong, residing now and forevermore in a state penitentiary,[1] was before 1996 an attorney who organized Ponzi schemes[2] and embezzled massive amounts of funds from his clients to support the snowballing Ponzi schemes and gambling debts. In 1990 Armstrong began experiencing financial difficulties. In order to rectify his problems, he began operating a Ponzi scheme based upon a non-existent timber contract. As in the nature of Ponzi schemes, his financial difficulties were exacerbated rather than rectified. In an effort to support the snowballing debts a rising from his scheme he borrowed money, and, in 1994, began gambling in hopes of winning enough money to fund the collapsing Ponzi scheme. Cheek kiting also became a means of supporting his new way of life. In the final days of his financial collapse Armstrong also defrauded elderly clients of their life savings. When one of his schemes was finally exposed, they all collapsed. On January 30, 1996, an involuntary bankruptcy petition was filed. An order for relief was entered on March 13, 1996.

The defendant operates the Las Vegas Casino ("LVC"), a gambling establishment located in Greenville, Mississippi. LVC is licensed and operates under the laws of the state of Mississippi and the regulations of the Mississippi Gaming Commission. *See generally* Miss.Code Ann. § 75–76–1, *et seq.*

Beginning in 1994, Armstrong became a "good customer" at LVC, and was considered in the top five to ten percent level of players. In 1994 and 1995, Armstrong made thirty-nine trips to LVC. In 1994, Armstrong won $31,000, but lost $65,000 at LVC. In 1995, Armstrong won $230,900, but lost $486,800 at LVC. The casino kept meticulous, accurate and copious computerized records on Armstrong, as it did on all of its numerous top level players. Indeed, the casino kept a database of the people from which they could determine numerous facts, including where the patrons were coming from. For some individual players the casino kept records called a "player trip analysis" of each trip to the casino. The trip analysis would include the amount of time spent in the casino, the amount of time at each table, the average wager at each table, as well as the theoretical and actual wins and losses.

LVC operated its credit system in a different manner from most of the other casinos at which Armstrong gambled. As a general rule, rather than issuing "markers"[3] to credit customers, LVC granted check cashing privileges at the casino to qualified individuals. In granting check cashing privileges, LVC obtained a copy of Armstrong's driver's license and credit card account number. He also provided the names of his banks and account numbers as well as an authorization allowing the casino to check his account balances. Thereafter, he was permitted to cash checks. In this manner, Armstrong could cash a check with the cashier, receive cash, then obtain chips from a particular gambling table. It is uncontroverted, that, upon cashing a check, there was no requirement that the funds be used in the casino. Upon cashing a check, Armstrong, like any other customer with such privileges, could walk out the door with the cash rather than spend the money on chips. Although referred to as a credit system, the privilege of cashing checks was not, unless other privileges were granted, considered an extension of credit by the casino. Not surprisingly, Armstrong never divulged his deep financial problems to anyone at the casino.

In addition to check cashing privileges, LVC also extended credit to Armstrong. LVC did have a marker system, although it was not their usual method of business. LVC had a four-part form, essentially a blank bank draft. Although the form states on its face that it is nonnegotiable, LVC

---

**1.** Armstrong has been sentenced to multiple concurrent terms totaling 156 years.

**2.** Ponzi schemes are schemes in which returns to investors are financed through funds from new investors rather than through the success of the underlying business venture. *See generally In re*

*Hedged–Investments Assoc.,* 48 F.3d 470 (10th Cir.1995).

**3.** A marker is an advance or loan which may be exchanged for cash or chips in order to gamble. *See United States v. Abodeely,* 801 F.2d 1020, 1022 (8th Cir.1986).

testified that they were considered as a negotiable instrument. Armstrong remembers only one instance of receiving a marker, but the evidence demonstrated that he received numerous markers from LVC.[4]

It is uncontroverted that, during the one year period prior to January 30, 1996, when the involuntary bankruptcy ease was filed, Armstrong customarily and regularly bet large sums of money at LVC, losing approximately $623,600 at the casino. The evidence was overwhelming that, in this one year period, the debtor was hopelessly insolvent. Further, it is clear that Armstrong was insolvent for at least several years prior to the filing of this bankruptcy case.

Although most of the checks to LVC were written on Armstrong's "farm account," a few checks were written on his law office escrow account, and at least nine checks were written on a business account labeled "Armstrong & Binns, Attorneys at Law, Escrow Account." Six of these nine checks were written in mid-December 1995, the other three being written one each in March, May and June 1995. Although labeled as an escrow account, LVC never asked Armstrong any questions about these checks.

## I. SECTION 548(a)(1): ACTUAL FRAUD

### A. The Trustee's Causes of Action

Counts I, V, and VIII of the trustee's complaint state causes of action for actual fraud. Count I seeks recovery of $623,600 expended at LVC in the year prior to bankruptcy under section 548(a)(1) of the Bankruptcy Code. Count V seeks alternative recovery under section 548(a)(1) of $87,500 for certain other credit transfers made by Armstrong in the year prior to bankruptcy. Finally, Count VIII seeks recovery of $109,000 under Arkansas law, Ark.Code Ann. §§ 4–59–204(a)(1), 4–59–207, for transfers made during 1994 and 1995.

Under Section 548(a)(1) of the Bankruptcy Code, the trustee may recover any transfer of an interest in property of the debtor, or an obligation incurred by the debtor, if the debtor made the transfer or incurred the obligation with the actual intent to hinder, delay, or defraud any entity. *See generally Brown v. Third National Bank (In re Sherman)*, 67 F.3d 1348 (8th Cir.1995). This statute is broad, not requiting by its terms that the fraud be directed at any particular entity. The section merely requires that an interest in property of the debtor be transferred and that the debtor made the transfer with fraudulent intent. Fraud or bad faith on the part of the recipient of the transferred interest is not an element of proof. Of course, proof of fraud by direct evidence is rare, such that the court must generally infer fraud from the circumstances of the transfer. *Id.* at 1353.

**Transfer of an interest of the debtor.** Armstrong obtained funds through numerous fraudulent methods, including his Ponzi schemes, check kiting, and embezzlement from his clients. These funds were deposited into his various accounts at local banks. It was from these accounts that he wrote checks to LVC, thereby passing title to the funds. *See Mossler Acceptance Co. v. Johnson*, 109 F.Supp. 157, 168 (W.D.Ark.1953) (title can be transferred to bona fide purchaser).[5]

**Transfer made with actual intent to defraud.** Armstrong knew that he could not pay his snowballing debts. Although he testified that, while actually gambling, he did not contemplate where he could obtain the funds to cover the checks he had written, he also testified that the consideration arose in his mind the next day. Although he may have been "driven" to gamble and to obtain funds to cover his illegal schemes, in fact he knew at the time he placed the bets that he could not *win* sufficient funds to cover his gambling losses and Ponzi schemes. Indeed, during 1994, Armstrong lost over $70,000.

---

4. Since the markers were limited in amount to $2,500, he would sign a large number of markers to obtain the funds for a single trip.

5. This is in contrast to the role that title to property taken by theft cannot be transferred. Title to stolen property remains with the owner. *Routh Wrecker Service, Inc. v. Wins,* 847 S.W.2d 707, 708, 312 Ark. 123 (1993); Ark.Code Ann. § 16–80–103.

He knew, despite his compulsion, that he could not in fact win sufficient funds to cover the losses and schemes.

Although it is true that a debtor's "honest but somewhat questionable belief that he would soon get lucky at gambling and pay off his debts" can defeat a finding of the requisite scienter, *AT&T Universal Card Services v. Alvi,* 191 B.R. 724, 734 n. 19 (Bankr. N.D.Ill.1996), Armstrong did not hold such a belief. There is no evidence that he was a gambling addict, which may require analysis under a more subjective approach. *Cf. AT & T Universal Card Services v. Crutcher (In re Crutcher),* 215 B.R. 696 (Bankr.W.D.Tenn. 1997). He was desperate, but not a fool.

Armstrong is a well educated and articulate man who deliberately ventured on a path of fraud and deception, heedlessly gambling the funds obtained through fraud. Indeed, he testified that he did not care where the money came from. He drafted, executed, and forged documents to support his Ponzi schemes, deliberately defrauding friends, business associates, clients, neighbors and anyone he could draw within his web. As he testified, in 1995, and particularly the last six months of that year, all of his working hours were spent supporting his schemes (many times into the early morning hours). He readily admitted that he began gambling, thereby making the transfers to LVC, in order to support the schemes. He not only had the requisite fraudulent intent in obtaining the funds, but also in transferring them to LVC because the transfers were admittedly made in pursuance of his efforts to maintain his various fraudulent schemes.

Further, he knew when he made the transfers that the effect would be to "hinder, delay, or defraud" numerous persons. He knew he could not continue to financially support the schemes because he did not have the assets or means to obtain funds to pay the debts he was incurring. He was writing checks against which he did not have funds on deposit. Accordingly, when making the transfers to LVC Armstrong had the actual intent to hinder, delay, or defraud any entity within the meaning of section 548(a)(1). *Cf. Karelin v. Bank of American (In re Kare-*

*lin),* 109 B.R. 943 (9th Cir. BAP 1990) (use to which borrowed funds put, knowledge of hopelessness of repaying through gambling, extent of assets and business experience evidenced fraudulent intent under section 523(a)); *American Express Travel Related Services Co. v. Nahas,* 181 B.R. 930 (Bankr. S.D.Ind.1994) (debt nondischargeable where debtor was gambling at level well above what he could ever hope to repay); *Chemical Bank v. Clagg,* 150 B.R. 697 (Bankr.C.D.Ill. 1993).

### B. *The Casino's Defenses*

◼ In light of the breadth of the cause of action under section 548(a)(1), as well as the parallel Arkansas statute, the Bankruptcy Code and Arkansas law provide the transferee with a defense of good faith:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the ease may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c). *Accord* Ark.Code Ann. §§ 4–59–208(a), (d), 4–59–203(a). Thus, a defendant may retain the funds transferred if it can prove that the transfer was made (1) for value *and* (2) in good faith. Of course, the recipient may retain the funds only to the extent of the value given.

**Value for the Transfer.** The trustee argues that no value was given because Arkansas has a strong policy against gambling activities, pointing to an Arkansas statute which permits a person to sue for recovery of funds lost in gambling. Ark.Code Ann. § 16–118–103. LVC asserts that it gave value in the form of cash in exchange for the check Armstrong tendered to LVC. The Court finds that value was in fact given for two reasons. First, Armstrong received cash in exchange for the checks. There is no question that cash money has value and the Court does not agree that cashing checks

necessarily constituted an extension of credit.[6]

■ Secondly, the Court does not agree that the existence of an Arkansas policy against *unregulated* gambling precludes a finding of value. The Arkansas statutes contain numerous provisions prohibiting unregulated gaming, the purpose of which is to discourage gambling. *Martin v. Wheatley,* 62 F.Supp. 104, 107 (W.D.Ark.1945).[7] Arkansas' policies against gaming, however, do not extend to regulated gambling. Arkansas law sanctions regulated horse racing under the Arkansas Horse Racing Law, Ark.Code Ann. § 23–110–101, *et seq.,* and dog racing, under the Arkansas Greyhound Racing Law, Ark.Code Ann. § 23–111–101, *et seq.* The state not only allows horse and dog racing, it expressly permits *regulated* wagering on these activities. Ark.Code Ann. §§ 23–110–405; 23–111–508. Further, although lotteries are not legal in Arkansas, it is not unlawful in the State of Arkansas to possess a lottery ticket issued in another state where a lottery is legal. Ark.Code Ann. § 5–66–118(a)(3). Thus, Arkansas not only permits gambling in certain regulated contexts, but also recognizes the opportunities to legally gamble in other states. Thus, there does not appear to be any Arkansas prohibition or policy against state sanctioned and regulated gambling in Arkansas or any other state. If Mississippi chooses to permit and regulate a certain type of gambling, Arkansas policies are not offended. Thus, Arkansas policies do not necessarily preclude application of Mississippi law or enforcement of valid and legal gambling debts incurred in Mississippi. *Cf. Mullinix v. Hubbard,* 6 F.2d 109 (8th Cir. 1925). Accordingly, Arkansas policies against unregulated gambling cannot be used to obviate the existence of value.

■ **Good Faith.** Good faith under this statute does not pertain to a lack of knowledge of the debtor's fraud. Rather, the inquiry is whether the transferee had knowledge of the debtor's insolvency. Good faith must be determined on a case-by-case basis using an objective standard of what the transferee knew or should have known. *Sherman,* 67 F.3d at 1555. The court is required to inquire into whether the recipient had inquiry notice of the debtor's insolvency and whether the transaction carried the earmarks of an arms-length bargain. *Id.*

LVC argues that even if it had made further inquiry, it would not have learned of any insolvency or other information depriving it of good faith. Even if LVC made further credit checks, it would have learned only that the local banks still considered Armstrong a good customer and that his checks continued to clear his accounts. Further, it is asserted that his close associates, and even his wife, were unaware of his financial difficulties. Indeed, on December 29, 1995, less than a month before this involuntary case was filed, one of the local banks gave Armstrong a loan.

The Court does not believe that LVC has demonstrated good faith for all periods of time. While it is true that Armstrong had been a good customer for a long period of time, there came a time where the continued extension of the credit gambling limits was not in good faith. At some point, LVC was not only on inquiry notice, Armstrong's insolvency was apparent. The debtor had been operating a Ponzi scheme for a long period of time. While LVC had no reason to know of this operation, the snowballing effect of the scheme had a strong and ascertainable impact upon Armstrong's finances and financial transactions. This impact was noticed by Simmons First National Bank in mid–1995 when Armstrong's rather new account at that bank evidenced "symptoms" of check kiting. Large sums of money were being channeled

---

6. The Court does not reach the question of whether LVC, by holding checks for a particular period of time before depositing them, extended credit to Armstrong. Although there was some evidence that LVC extended this courtesy to Armstrong, the Court cannot identify any particular checks that received this treatment.

7. Likewise, Mississippi also has numerous statutes against unregulated gaming. *See, e.g.,* Miss. Code Ann. §§ 97–33–1, *et seq.* (gambling crimes), 95–3–25 (nuisance). Indeed, Mississippi's Gaming Control Act contains stronger language against gaming as impacting upon the morals and policy of the people of Mississippi than that contained in the Arkansas statutes. *See, e.g.,* Miss.Code. Ann. § 75–76–3.

through several of his accounts,[8] although he actually kept a low balance compared to the sums he was gambling. He was not only betting very large sums of money, he gave exorbitant tips to the dealers.[9] The casino was aware that, in contrast to his very large bets and tips, Armstrong's income was derived primarily from a country legal practice and a fish farm, and that his bank accounts never maintained a balance commensurate with his spending at LVC, much less at all of the casinos.

By the spring of 1995, Armstrong had credit with several casinos. LVC was aware that other casinos extended large sums of credit to Armstrong. Indeed, each of the casinos had access to a Central Credit bureau especially for gambling establishments which informed each of them of the amounts of credit extended to Armstrong by each casino, current balances owed, and basic information on Armstrong's history of play. For example, in mid-October 1995, LVC and the other casinos knew that Armstrong had a $30,000 limit at Fitzgerald's casino and a balance due of $30,000. At Harrah's in Tunica, Mississippi, Armstrong had a limit of $50,000 and a balance of $50,000; at Harrah's in Shreveport, Louisiana, he had a limit of $50,000; at LVC a $20,000 limit and exclamation points in the balance column. Armstrong also had credit limits at Horseshoe and Hollywood casinos, located in Robinsville, Mississippi and Tunica, Mississippi.

With this information, other casinos were terminating Armstrong's credit. As early as August 23, 1995, the credit manager at Harrah's—Shreveport indicated that they had Armstrong "in over his head" and "strongly suggest[ed] no more increases." Harrah's—

Shreveport canceled Armstrong's credit on September 13, 1995, and declined to renew it.[10] By mid October 1995, Central Credit, the casinos' credit reporting service, had the information that Harrah's—Shreveport had not only canceled Armstrong's credit, but it had also decided to keep him on a cash basis at least until the other casinos had been paid. Thus, at least one other casino, although believing that Armstrong would pay the outstanding markers, determined, on the basis of the balances at other casinos, that Armstrong should not be extended further credit. On November 1, 1995, Fitzgerald's casino suspended Armstrong's credit, reinstating a limit of $10,000 and $25,000 on November 19, and 20, 1995. Fitzgerald's, in the regular course of its business, ran five or six credit bureau reports on Armstrong in the months of November and December, indicating that they were watching his play and finances. Sheraton in Tunica, Mississippi rejected Armstrong's application on December 16, 1995.

On December 16, 1995, Armstrong had a balance at LVC of $60,000; at Horseshoe, $10,000, at Hollywood, $50,000; at Harrah's—Tunica, $41,000, Fitzgerald's, $30,000, for a total of $191,000. In contrast, the bank information showed that the maximum balance in any of his accounts was no more than $1,000. It was also in mid-December that Armstrong wrote the greatest number of checks out of the "Armstrong & Binns, Attorneys at Law, Escrow Account."[11] Indeed, six of the nine checks (totaling $66,000) he gave to the casino from this account were dated December 21, 1995. The mere name

---

8. It is amazing that Armstrong's other banking institutions did not also perceive these "symptoms" and take similar action.

9. These tips, or "tokes" took either the form of bets placed by Armstrong for the dealer's benefit, or in the form of chips given directly to the dealers. *See generally Allen v. Department of Treasury,* 976 F.2d 975, 975 & n. 1 (5th Cir. 1992). Armstrong was known to tip dealers $600 to $2,000 in a night and give the cocktail waitresses $25 for a drink, "a fairly nice tip."

10. This casino was also aware that Armstrong had a friend apply for credit in order for Arm-

strong to gamble on that credit. The casino did not approve the request for credit.

11. Escrow is "a scroll, writing, or deed, delivered by the grantor, promisor or obligor into the hands of a third person, to be held by the latter until the happening of a contingency or performance of a condition, and then by him delivered to the grantee, promisee or obligee." Blacks Law Dictionary 641 (Rev.4th ed.1968). A layman would certainly understand that funds in escrow are essentially held in trust. *See* Merriam Webster's Collegiate Dictionary 395 (10th ed.1997).

on this account should have raised suspicions at LVC.[12]

By the end of 1995, Armstrong had been gambling at LVC for well over a year. He was considered a good customer, had paid all of his markers, and his checks consistently cleared. In this regard, LVC's situation was different from the other casinos. Being a "top level player," a good customer, with a consistent record of payment, they were indeed entitled to place reliance upon this history and relationship. There came a point, however, in late 1995, that it was so apparent that Armstrong was "over his head" that LVC was not entitled to rely solely on his level of play and the eighteen month relationship. There was simply too much evidence of his insolvency. Armstrong was gambling incredibly large amounts of money, not only at LVC, but also at a number of other casinos. He was traveling further and to inconvenient towns to obtain credit and gamble at other casinos. In October 1995, he applied for and received credit at three additional casinos. On December 2, 1995, Horseshoe casino granted him credit. He had large credit limits at the other casinos, which, unlike LVC, had marker systems. In contrast to these increasingly precarious gambling practices, he maintained low balances in his bank accounts. It was obvious that his income was not commensurate with his level of play or increasing debt limits. No later than the beginning of December 1995, it was clear that Armstrong was not solvent such that after that date LVC cannot maintain a defense of good faith.

### C. *The Trustee's Recovery*

The evidence establishes that the trustee is entitled to recover the transfers made from and after December 7, 1995. Accordingly, the trustee is entitled to recover on the transfers made on December 7, 8, 21, and 29, 1995, in the amounts of $30,000, $36,000, $66,000, and $28,000 for a total of $160,000.

## II. *SECTION 548(A)(2): CONSTRUCTIVE FRAUD*

Under the constructive fraud provisions of the Bankruptcy Code, 11 U.S.C.

§ 548(a)(2), as well as under Arkansas law, Ark.Code Ann. § 4–59–207, the trustee may avoid any transfer of an interest of the debtor in property if the debtor received less than reasonably equivalent value for the transfer and the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. Under Count VI, the trustee seeks to avoid transfers in the amount of $976,600 in gambling debts the debtor paid in cash, chips, personal checks and cashier's checks. As an alternative, under Count VII, the trustee seeks to avoid the payments debtor made to reduce the outstanding gambling obligations in the amount of $115,500. Finally, under Count IX the trustee seeks to avoid $109,000 of fraudulent transfers under Arkansas law.

The trustee asserts that reasonably equivalent value does not exist because, not only were the gambling debts unenforceable under Arkansas law, but also that the debtor could have sued LVC to recover those losses incurred within ninety days of the bankruptcy. *See* Ark.Code Ann. § 16–118–103. Thus, the trustee argues, reasonably equivalent value cannot exist.

It is a fundamental principle of American law that the laws of another jurisdiction are valid and enforceable in any state which can obtain jurisdiction over the defendant, provided it is not against the public policy of the laws of the state in which it is sought to be enforced. *Cf. Mullinix v. Hubbard,* 6 F.2d 109 (8th Cir.1925). State policies against gaming and wagering are, in the majority of cases, used to preclude enforcement of claims based upon gambling debts. *See, e.g., Carnival Leisure Industries v. Aubin,* 938 F.2d 624 (5th Cir.1991). However, the Eighth Circuit has held, in an Arkansas case, that such policies do *not* preclude enforcement of what Arkansas considered to be a gambling contract where that contract was valid and legal in the place of contracting. *Mullinix v. Hubbard,* 6 F.2d 109 (8th Cir.1925).

Second, as discussed above, although the State of Arkansas seeks to discourage unreg-

---

**12.** Indeed, the funds were escrowed for several elderly clients who had entrusted their life sav- ings to their attorney.

ulated gambling, Arkansas' policies against gaming, do not extend to regulated gambling.[13] Since Arkansas policies do not necessarily preclude application of Mississippi law or enforcement of valid and legal gambling debts incurred in Mississippi, Arkansas policies against unregulated gambling cannot be used to negate reasonably equivalent value.

LVC asserts that reasonably equivalent value exists such that recovery must be denied under the rationale of *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769 (6th Cir.1995), *cert. denied*, 517 U.S. 1168, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996). In *Chomakos*, the Sixth Circuit Court of Appeals held that reasonably equivalent value exists for a wager when a bet is placed. The Sixth Circuit reasoned that, since gambling is legal, when a bet is placed, legally enforceable contract rights arise. Those contract rights are property; the placing of the bet, therefore, is the transfer of property. The subsequent depreciation or appreciation of the value of the wager (*i.e.*, winning or losing) does not change reasonably equivalent value since the focus is the actual time of the wager, not the result. At that time no one can know whether the bet will have a successful outcome. Hence, like an investment in a commodities future, it has economic value.

This court, following *Chomakos*, finds that reasonably equivalent value exists with regard to the transfers such that recovery un-

der counts VI, VII, and IX, under theories of constructive fraud, must be denied. *See also Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458 (4th Cir.1990); *Samson v. U.S. West Communications, Inc. (In re Grigonis)*, 208 B.R. 950 (Bankr.D.Mont.1997).

## III. *SECTION 547(b) PREFERENCE*

Under Count IV, the trustee seeks to recover extensions of credit given to Armstrong within the ninety-days of the bankruptcy. On November 13, 1995, Armstrong gave LVC a $29,500 check to redeem prior markers; the check was honored on November 17, 1995. On December 28, 1995, Armstrong gave LVC a $28,000 check to redeem prior gambling obligations in the form of markers; that check cleared on January 4, 1996.

Under section 547 of the Bankruptcy Code, the trustee may avoid a transfer of an interest of the debtor made on an antecedent debt that entitles the creditor to receive more than other unsecured creditors.[14] *See Buckley v. Jeld–Wen, Inc. (In re Interior Wood Products Company)*, 986 F.2d 228 (8th Cir. 1993).

The plaintiff bears the burden of proving the elements of avoidability under section 547(b). *Nordberg v. Arab Banking Corporation (In re Chase & Sanborn Corporation)*, 904 F.2d 588, 595 n. 15 (11th Cir.

---

**13.** The Arkansas Legislature declared that horse racing "and activities related thereto in Arkansas have had a most significant favorable impact on the economy of the entire state and the welfare of our citizens and residents...." 1987 Ark. Acts, No. 440, § 8;

**14.** Section 547 provides in pertinent part:
The trustee may avoid any transfer of an interest of the debtor in property—
(1) to and for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within ninety days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

$$* \quad * \quad * \quad * \quad * \quad *$$

(f) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.
(g) For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.
11 U.S.C. § 547(b), (f), (g).

1990). However, the creditor or transferee bears the burden of providing affirmative defenses it raises pursuant to section 547(c). *Nordberg*, 904 F.2d at 595 n. 15. Although affirmative defenses were raised in the answer, these were not pursued in the later briefs, nor at trial.

■ The facts governing these elements are not largely in dispute. Extensions of credit in the form of markers were given to Armstrong on October 27, 1995. The giving of a marker was, in effect, an extension of credit to Armstrong which was paid at a later date. Thus, Armstrong's payment in redemption of these markers on November 13, 1995, and December 29, 1995, the checks clearing on November 17, 1995, and January 4, 1996, respectively, were payments on an antecedent debt for the benefit of the creditor, LVC. There is no dispute that Armstrong was insolvent and that these transfers were made within the 90 days of the bankruptcy. The trustee testified that there would be no dividend to unsecured creditors in this case such that LVC received more than it would in a chapter 7 liquidation.

Accordingly, the trustee is entitled to recovery on Count IV of the complaint in the amount of $57,500. Of course, since the trustee may not have a double recovery, 11 U.S.C. § 550(d), and $28,000 of this amount is included in the trustee's recovery under Count I of the complaint, the total collection may not exceed the maximum amount of these avoidable transfers. The remainder, $29,500, however, is recoverable in addition to the $160,000 under Count I of the complaint.

## IV. ARKANSAS CODE § 16–118–103

■ Counts II and III of the complaint seek recovery of the debtor's gambling losses and markers in the ninety days preceding bankruptcy. Arkansas law provides that

> Any person who loses any money or property at any game or gambling device, or any bet or wager whatever, may recover the money or property by action against the person winning the money or property. The suit shall be instituted within ninety (90) days after the paying over of the money or property so lost.

Ark.Code § 16–118–103. Under this statute, the trustee seeks to recover the funds wagered and lost in the 90 days prior to the filing of the petition, a total of $281,500. Alternatively, the trustee seeks to recover the $57,500 expended through credit transactions during the 90 days prior to the filing of the bankruptcy case.

The court agrees with the defendant that this statute has no application in this case because, as discussed above, the gambling debts are not only valid and enforceable in Mississippi, the situs of the transactions, but also, as discussed above, Arkansas recognizes the validity of these out-of-state regulated contracts. *See Mullinix v. Hubbard*, 6 F.2d 109 (8th Cir.1925); *cf. Brace v. Gauger–Korsmo Const. Co.*, 36 F.2d 661 (8th Cir. 1929), *cert. denied*, 281 U.S. 738, 50 S.Ct. 333, 74 L.Ed. 1153 (1930). In *Mullinix*, like this case, the purchases and sales in question were made in another state where the commodity transactions were legal such that the Arkansas statute outlawing such transactions could not be invoked to invalidate the debtor's actions. Similarly, the debtor's gaming activities which took place at LVC in Mississippi were legal such that this Court will not apply a statute which would, if the court accepts the trustee's argument, in effect, invalidate those legal activities.

## V. *LVC'S RIGHT TO OFFSET*

■ On January 14, 1996, Armstrong wrote seven checks to LVC which were returned for insufficient funds. LVC seeks to offset this debt of $71,000 under 11 U.S.C. § 553 against any recovery had by the trustee. It is well settled that a creditor cannot offset its liability under the preference section of Bankruptcy law. *See Mechanics' & Metals National Bank v. Ernst*, 231 U.S. 60, 34 S.Ct. 22, 58 L.Ed. 121 (1913) (Holmes, J.); *Freehling v. Michigan Repacking & Produce Co.*, 426 F.2d 989, 991 (5th Cir.1970). The same holds true for actions by the trustee under section 548 of the Bankruptcy Code. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 817 (9th Cir.1994); *Bustamante v. Johnson (In re McConnell)*, 934 F.2d 662, 667 (5th Cir.1991). Such an offset

would, in effect defeat the very purpose of the avoidance statutes, *see generally Collier on Bankruptcy*, ¶ 553.0313][e][v] (15th rev. ed.1997). Accordingly, LVC's request for offset under section 553 is without merit.

## VI. *CONCLUSION*

The trustee is entitled to recovery under Counts I for the transfers occurring from and after December 7, 1995, a total of $160,-000. The trustee is also entitled to recover under Count IV of the complaint in the amount of $57,500. Of course, the trustee recognizes that he is entitled to only a single satisfaction of the transfers. 11 U.S.C. § 550(d).

**IT IS SO ORDERED.**

## *ORDER DENYING IN PART AND GRANTING IN PART MOTION TO AMEND*

THIS CAUSE is before the Court upon the trustee's Motion to Amend Findings of Fact and Conclusions of Law and Judgment, filed on February 25, 1998, to which the defendant responded on February 26, 1998. The trustee requests that the Court amend its findings and judgment to include prejudgment interest from the date the complaint was filed against the defendant, on December 20, 1996, to the date of the entry of the judgment, on February 20, 1998.

 As a general rule, prejudgment interest may be awarded on federal claims. *See generally Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 833–36 (2d Cir.1992) (good discussion of history and application of awards of prejudgment interest). Prejudgment interest may be awarded to compensate a party for the denial of the use of funds, *West Virginia v. United States*, 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 706 n. 2, 93 L.Ed.2d 639 (1987), or where the defendant could have ascertained the amount of the preferential payment without a judicial determination, *i.e*, if the claim was liquidated, *Bank of Mulberry v. Fireman's Fund Ins. Co.*, 720 F.2d 501, 503 (8th Cir.1983), or can be readily ascertained by determination according to a recognized standard. *United States v. Dimarco Corp.*, 985 F.2d 954, 959

(8th Cir.1993). Prejudgment interest is awardable from the date of the filing of the complaint in preference actions. *Jacoway v. Anderson (In re Ozark Restaurant Equip. Co.)*, 96 B.R. 187, 192 (Bankr.W.D.Ark.1988) (Baker, J.). Whether such interest should be awarded, however, is within the discretion of the trial court. *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275 (8th Cir.1988).

 In the instant case, the amount for which the defendant could ultimately be liable was not readily ascertainable. In light of the defense of good faith and the continuing nature of the transactions, the defendant could not determine, without judicial intervention, its liability, if any. Neither the fact nor the amount of the judgment could be known until trial and findings of fact by the court. Thus, the trustee's claims under 548(a)(1) were neither liquidated nor readily ascertainable. *Cf. United States v. Dimarco Corp.*, 985 F.2d 954, 959 (8th Cir.1993); *See generally Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 835 (2d Cir.1992). The degree of speculation together with the existence of the good faith dispute with regard to the section 548(a)(1) action, the lack of knowledge on the part of the defendant of the debtor's actual fraud, and the purposes of the statute indicate that an award of prejudgment on the section 548(a)(1) recovery, under the facts of this case, are not merited. *See Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 835 (2d Cir.1992); *Moore & Munger Marketing & Refining, Inc. v. Hawkins*, No. 90–1120, 1991 WL 335994 (W.D.Ark. Oct. 7, 1991) (Harris, J.) (bankruptcy court did not err in denying prejudgment interest based upon equitable considerations); *cf. Louis & O'Fallon Ry. v. United States*, 279 U.S. 461, 483, 49 S.Ct. 384, 387, 73 L.Ed. 798 (1929) (good faith dispute in suit under Interstate Commerce Act to recover excess income precluded award of prejudgment interest).

 The same does not hold true with regard to the trustee's preference action under section 547. The application of the elements of this statutory action are readily determined, as was the amount of recovery. Indeed, an analysis of the statute, and the

lack of a worthy defense, indicate that the trustee's recovery was probable. The amount being readily ascertainable and the trustee having been deprived of the use of the funds, the trustee is entitled to prejudgment interest with regard to his recovery on the preference action.

**IT IS ORDERED** that the trustee's Motion to Amend Findings of Fact and Conclusions of Law and Judgment, filed on February 25, 1998, is Granted in part and Denied in part. The judgment shall be amended to include prejudgment interest on Count IV of the complaint from and after December 20, 1996.

**IT IS SO ORDERED.**

### AMENDED JUDGMENT

This action came on for trial before the Court, Honorable Mary Davies Scott, U.S. Bankruptcy Judge, presiding, and the issues having been duly tried and a decision having been duly rendered,

It is Ordered and Adjudged that the plaintiff William S. Meeks, Trustee, recover of the defendant the sum of $160,000 on Count I of the complaint, with interest from February 20, 1998, as provided by law, and $57,500 on Count IV of the complaint, subject to the limitation of 11 U.S.C. § 550(d), with prejudgment interest on $57,500 from December 20, 1996, as provided by law, and his costs of action.

It is so Ordered.