## In re Murray F. ARMSTRONG.

### William S. Meeks, Trustee, Plaintiff,

### v.

### Red River Entertainment of Shreveport, Partnership in Commendam d/b/a Harrah's Shreveport Casino, Defendant.

#### Nos. 96–50087 S, PB–C–99–156.

United States District Court,
E.D. Arkansas,
Western Division.

Feb. 28, 2001.

---

Thomas S. Streetman, Streetman & Meeks, Crossett, AR, for plaintiff.

Richard L. Ramsay, Eichenbaum, Liles & Heister, P.A., Little Rock, AR, for defendant.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

The bankruptcy trustee appeals the bankruptcy court's decision dismissing the trustee's complaint to avoid and recover as fraudulent the transfer, within one year of the filing of an involuntary chapter 7 bankruptcy petition, of $357,000.00 to Red River Entertainment of Shreveport, Partnership in Commendam d/b/a Harrah's Shreveport Casino (Harrah's) by Murray F. Armstrong (debtor) to pay gambling debts due to the fact that the bankruptcy court made, among others, the following findings: (a) that debtor received value when debtor received extension of credit and funds to gamble with from Harrah's, and (b) that Harrah's acted in good faith since "Harrah's did not have reason to know of debtor's financial difficulties and insolvency ... [accordingly] Harrah's is protected by the good faith defense [under 11 U.S.C.] section 548(c)." However, the bankruptcy court found that debtor, an attorney with a practice in two rural communities and served as a part time municipal judge, began experiencing financial difficulties in 1990, and, in an effort to rectify the problem, began operating a Ponzi[1] scheme based upon non-existing timber

1. A Ponzi scheme is a fraudulent investment project in which investors are paid profits from nothing more than the principal sum paid by newly attracted investors and not from any underlying business venture. See: *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924).

contracts; that debtor wrote checks when debtor did not have funds on deposit; that debtor engaged in check kiting and defrauded elderly clients of their life savings; and that "when debtor made transfers to Harrah's, [debtor] had the actual intent to hinder, delay, or defraud any entity."

The Court, after carefully reviewing the record, finds that the bankruptcy court clearly erred in finding that Harrah's acted in good faith in its dealings with debtor and did not have reason to know of the debtor's financial difficulties and insolvency and, accordingly, the judgment of the bankruptcy court is vacated and this action is remanded to the bankruptcy court for entry of a judgment in behalf of the trustee for the reasons hereinafter discussed.

I

BACKGROUND

Murray F. Armstrong, a small town attorney in Star City, Arkansas, population 2,200 who had served as a part time municipal judge (debtor), encountered financial problems in 1990. In an attempt to deal with this problem, debtor began operating a Ponzi investment project based on bogus timber contracts and sham land transactions. Endeavoring to pay his Ponzi debts, debtor began gambling in 1994 at riverboat casinos in Louisiana and Mississippi. In 1995, debtor entered upon an all-out check kiting scheme and embezzled large sums of money from his clients.

On May 5, 1995, debtor applied for a line of credit at Harrah's which was granted. The line of credit extended the privilege to debtor to sign markers in exchange for chips. See *United States v. Abodeely*, 801 F.2d 1020 (8th Cir.1986) (a marker is a form of check or type of loan from the casino which permits the patron to gamble on credit by acquiring gaming chips. It is drawn on a designated bank). Harrah's extended debtor the following lines of credit which afforded debtor the opportunity to gamble:

| Date | Casino Credit Line |
| --- | --- |
| 05/05/95 | $ 15,000.00 |
| 05/06/95 | $ 20,000.00 |
| 06/23/95 | $ 25,000.00 |
| 06/24/95 | $ 30,000.00 |
| 06/26/95 | $ 30,000.00 |
| 07/15/95 | $ 35,000.00 |
| 07/15/95 | $ 50,000.00 |
| 07/17/95 | $ 30,000.00 |
| 07/28/95 | $ 60,000.00 |
| 07/28/95 | $ 70,000.00 |
| 07/31/95 | $ 70,000.00 |
| 08/11/95 | $ 75,000.00 |
| 08/12/95 | $100,000.00 |

Harrah's had a policy of holding markers for seven days before depositing them for payment, however, Harrah's would hold markers up to thirty days as a matter of courtesy to its patrons. Debtor paid Harrah's $357,000.00 in 1995. These payments consisted of $189,000.00 in markers which were paid by debtor's bank at Rison, Arkansas, when presented for payment and the sum of $168,000.00 was paid directly to Harrah's with debtor's personal and cashier's checks to redeem prior markers which Harrah's was holding for payment.

During 1995, debtor generally had negative balances in his bank accounts and debtor was overdrawn in his Farm Account was which used to cover all markers and personal checks. In addition, debtor had less than $10,000.00 income for 1995 and his net income for 1994 for two law offices, Star City and Rison, Arkansas, was $26,142.28.

In January 1996, debtor's schemes collapsed and debtor was placed in involuntary bankruptcy by defrauded creditors on January 30, 1996.[2] On March 12, 1996, William S. Meeks (trustee) was appointed trustee for debtor. On September 15, 1997, Trustee filed his Second Amended and Substituted Complaint against Harrah's seeking to avoid and recover the debts debtor paid Harrah's in sum of $357,000.00 based on 11 U.S.C. § 548(a)(1),

2. On August 15, 1997, debtor pled guilty to thirty felonies of taking unauthorized control of property and was sentenced to 156 years in prison.

actual fraud, and 11 U.S.C. § 548(a)(2), constructive fraud.

During the bankruptcy proceedings, the trustee presented evidence concerning the circumstances surrounding debtor's and Harrah's bargain whereby debtor received extension of credit and funds to gamble with.

The trustee called Scott Onque to testify. Mr. Onque joined Harrah's on September 10, 1995, and became Harrah's casino comptroller and served as manager of the credit department, cashiering operations and count room operations. Mr. Onque testified, based on records prepared before he joined Harrah's, that on May 5, 1995, debtor executed a credit application that authorized Harrah's to investigate debtor's credit record and "furnish information concerning such record to credit reporting agencies and others who may properly receive this information."[3] Mr. Onque testified that while debtor's application was approved and a line of credit of $15,000.00 was extended, debtor's application did not designate the amount of his assets at that time, neither the debtor's income for 1995, nor his total liabilities. Mr. Onque further stated "[t]hat is not information that we request on the application process, so you will not find that in any of our documents." In response to the question whether this information was sought during the course of granting increases in debtor's credit allowance, Mr. Onque stated: "That's not common practice." Mr. Onque further testified that an entry in debtor's file on May 8, 1995, reflect that debtor had a "fed tax lien against him."

The trustee presented evidence demonstrating that debtor had net gambling losses at Harrah's in 1995 of $211,400.00. Trustee's expert witness, Richard L. Maxwell, CPA, testified that debtor would have needed to earn $348,962.00 in 1995, just to pay his net gambling losses, state and federal taxes which would be owed on that amount of income. However, the Trustee presented evidence showing that in 1995, debtor had a net income of $9,919.24; debtor was consistently over drawn in his bank accounts during the four months prior to May 5, 1995; and that when Harrah's checked debtor's bank account level, Harrah's knew that debtor's bank account level was decreasing from $4,000.00— $6,000.00 level down to zero while Harrah's increased debtor's unsecured credit from $20,000.00 to $100,000.00.

The trustee also offered evidence revealing that on August 23, 1995, Chris Carter, a credit supervisor for Harrah's, acknowledged in a memorandum: "We appear to have Mr. Armstrong in over his head. I strongly suggest no more increase."[4] However, on August 26, 1995, Harrah's permitted debtor to bet twice the amount of the house limits for other patrons.

The trustee also presented evidence reflecting that between May, 1995 and September, 1995, debtor's bank balances varied between a minus $317,717.93 in May

---

3. Under the Louisiana's Gaming Regulation, Harrah's was restricted to extend credit "only in a commercially reasonable manner considering the assets, liabilities, prior payment history and income of the patron." *See* Plaintiff's Exhibit 61. *See* also Louisiana Gaming Regulation § 42:XIII.2715(k).

4. On or about July 30, 1995, debtor's credit line was increased to $70,000.00 while on July 31, 1995, pursuant to request made on July 17, 1995, Harrah's received information from a bank stating that debtor's account "On 7-31-95 NCC good for 1500."

On August 23, 1995, "Mr. Armstrong [debtor] had his friend Stephen Lovett apply for credit so that he could use the money."

On September 13, 1995, Harrah's received notice from the Bank of Rison that markers totaling $28,000.00 would be returned due to insufficient funds in debtor's account. On September 29, 1995, a $19,000.00 cashier check made payable to debtor was submitted to Harrah's to redeem certain markers. Harrah's requested the Bank of Star City to verify that the check was "legitimate." On the same date, debtor presented a personal check in the sum of $9,000.00 on the Bank of Rison to redeem the balance of the markers returned.

when the credit line was extended to a minus $132,717.73 in September when the credit line was closed.

Harrah's called Scott Onque to testify in its desire to establish the affirmative defenses under 11 U.S.C. § 548(c), in essence, that debtor received value in exchange for the transfers to Harrah's and that Harrah's acted in good faith in its dealings with debtor.

Mr. Onque testified that after reviewing debtor's application to participate in Harrah's market system, bank reports, reports from Las Vegas Casino disclosing that debtor did not have any unpaid debts, the fact that debtor did not have any debts unpaid at Harrah's and no reports that any personal checks or markers were returned by banks due to insufficient funds, he was of the opinion that debtor was a "good player with a good credit history."

Mr. Onque testified that he was given the responsibility to establish the internal policies for two casinos in Louisiana in order to make sure these casinos were in compliance with the Riverboat Gaming Act of Louisiana; that his current responsibility at Harrah's is to make sure that Harrah's follows the guidelines and comply with the law; that Harrah's been audited by the regulatory body and has not been found in non-compliance and that in his opinion Harrah's followed the standard in the industry in its dealings with debtor.

After hearing the evidence, the bankruptcy court found that trustee had proven all elements under 11 U.S.C. § 548(a)(1), actual fraud, necessary to avoid the transfers to Harrah's. However, the bankruptcy court further found that Harrah's proved that it gave value and acted in good faith since "Harrah's did not have reason to know of debtor's financial difficulties and insolvency ... [accordingly] Harrah's is protected by the good faith defense [under 11 U.S.C.] section 548(c)." The trustee now challenges the bankruptcy court's judgment, as amended, dismissing his complaint against Harrah's.

## II.

## DISCUSSION

The trustee raises the following three issues on appeal: (1) The bankruptcy court erred in its legal conclusion that Arkansas does not have a strong public policy against casino gambling and gambling on credit. Consequently, the court erroneously concluded that debtor received value when he paid his gambling debts to appellee. (2) The bankruptcy court clearly erred in finding appellee acted in good faith when it extended credit to debtor and when debtor paid his gambling debts to appellee. (3) The bankruptcy court erred in its legal conclusion that debtor received reasonably equivalent value when he paid his gambling debts to appellee.

■ The standard of review requires that the bankruptcy court's legal conclusions be reviewed de novo and its factual findings for clear error. *In re Howell Enters.*, 934 F.2d 969, 971 (8th Cir.1991); *In re Forbes*, 218 B.R. 48 (8th Cir. BAP 1998).

## A.   Good Faith Under 11 U.S.C. § 548(c)

■ Section 548(c) provides:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 or this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

■ The Court of Appeals in *Brown v. Third National Bank*, 67 F.3d 1348 (8th Cir.1995), in emphasizing that good faith is an indispensable element in establishing a transferee's lien and preserving the transfer under § 548(c) made the following observation:

Good faith is not susceptible of precise definition and is determined on a case-by-case basis. (citation omitted) To determine whether a transferee acts in good faith, "courts look to what the transferee objectively 'knew or should have known'" instead of examining the transferee's actual knowledge from a subjective standpoint. (citations omitted) In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency.

This Court is persuaded that Harrah's did not engage in a diligent inquiry, regarding debtor's assets, liabilities and income before extending credit to debtor, but engaged in a hasty and meaningless inquiry pertaining to, essentially, debtor's obligations to gambling entities in debtor's past gambling activities. Mr. Onque testified that debtor's application for a line of credit, which was executed on May 5, 1995, did not designate the amount of his assets at that time, neither the debtor's income for 1995, nor his total liabilities. Mr. Onque further stated that Harrah's assumed the value of debtor's assets and the extent of his liability after reviewing a consumer credit report and a bank report along with reports from Las Vagas Casino disclosing that debtor did not have any unpaid debts with that entity; and that debtor did not have any debts unpaid at Harrah's as well as information that any personal checks or markers given by debtor to Harrah's and Las Vagas Casino had not been returned due to insufficient funds. Mr. Onque conceded that it could not be determined from the reports reviewed the extent and value of debtor's assets; and that Harrah's did not, before extending a $15,000.00 credit line on May 5, 1995, make "a direct call to the bank."

Mr. Onque testified as follows in response to questions posed by the trustee's attorney during the course of the trial:

Q. Now look at Plaintiff's Exhibit 23–F, a credit increase from $50,000 to $60,000 on July 28, 1995.

A. Uh-huh.

Q. Now, look at the second page of Plaintiff's Exhibit 23 and tell me what banking information that you had on July 28 when you increased the credit to $60,000.

A. We were relying on his bank information from 7/17/95.

Q. And the bank information on 7/17/1995 indicated that he had a Low–4 balance which would be one to $3,000?

A. That's correct.

. . . .

Q. And, if you will now, look at Plaintiff's Exhibit 23–H, a credit increase on August 12th, 1995 from seventy to $75,000. What banking information did you have at the time you increased Mr. Armstrong's credit from seventy to $75,000 on August 12th, 1995?

A. We relied on the bank information from 7/31/95.

Q. Which indicated that Mr. Armstrong was good for $1,500?

A. Good for $1,500.

Q. And, tell me—you may have said this a moment ago. I don't recall—what does good for $1,500 mean to you?

A. That means a $1,500 check would clear.

. . . .

Q. Now, look at Plaintiff's Exhibit 23–I, credit increase to Mr. Armstrong again on August 12, 1995 from $75,000 to a $75,000 to a $100,000. What banking information did you have on Mr. Armstrong on August the 12th, 1995 when you increased his credit level to a hundred thousand dollars?

A. We had the bank information from 7/31/95.

Q. Which showed that a check would be good for $1,500 on that account?

A. That is correct.

Q. And that he had maintained an average in that account of one to $3,000?

A. That is correct.

. . . .

Q. At that time, you did not know what his annual income was, did you?

A. We had information on what type of work he did.

Q. I understand that. But you didn't have any information on his average annual income at the time you increased him to $100,000, did you?

A. Not specifically.

Q. And you didn't know how many assets, value of assets, that he owned at that time, did you?

A. Nothing documented.

Q. And you didn't know what his total liabilities were at that time?

A. No. We did not. (Volume II Tr. at 251–254).

In addition, Harrah's, in a relatively short span of time after approving debtor's application for credit, became aware of certain circumstances to place Harrah's on inquiry notice of debtor's potential insolvency. In particular, on May 8, 1995, an entry was made in debtor's file at Harrah's that debtor had "fed tax lien against him[;]" Harrah's received information from debtor's bank on July 31, 1995, stating that debtor's account "On 7–31–95 NCC good for 1500[;]" and debtor had his friend, Stephen Lovett, apply for credit so that debtor could use the money to gamble. On August 23, 1995, a credit supervisor for Harrah's noted in a memorandum: "We appear to have Mr. Armstrong (debtor) in over his head. I strongly suggest no more increases." Around August 12, 1995, debtor signed markers to Harrah's totaling $55,000.00. Harrah's held the markers for approximately two weeks until debtor redeemed them with a cashier's check on August 25, 1995, drawn on Bank of Rison. (See: Volume II Transcript at 262–264). Again, on or about September 29, 1995, debtor delivered a personal check in the sum of $9,000.00 and a $19,000.00 cashier's check drawn on the Bank of Star City to redeem returned markers and Harrah's requested "the bank verify that the $19,000 cashier's check was a legitimate check and had no stop payments on it." (See: Volume II Transcript at 265–268) It was Harrah's policy to hold markers for only seven days.

■ Harrah's possessed the responsibility and burden of establishing good faith under § 548(c). See: 5 Collier on Bankruptcy ¶ 548.10 at 548–80. In view of the circumstances just discussed, this Court is persuaded that Harrah's failed to establish good faith under the objective standard of § 548(c). Harrah's possessed sufficient knowledge to place Harrah's on inquiry notice of debtor's possible insolvency and, therefore, Harrah's is not entitled to the good faith defense pursuant to § 548(c). Accordingly, this Court further finds that the bankruptcy court clearly erred in finding that Harrah's is protected by the good faith defense under § 548(c).

Since good faith is an indispensable element of a successful defense to the trustee's action to void the transfers made by debtor and the Court has found that Harrah's may not assert good faith, this Court is of the view that it is not necessary to deal with the issue of value raised by the trustee on appeal.

## CONCLUSION

For the reasons set forth about, the Court vacates the judgment of the bankruptcy court and remand this action for entry of judgment in behalf of the trustee.