# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1607

_____

| | | |
|---|---|---|
| In re:  Murray F. Armstrong, | * | |
| | * | |
| Debtor, | * | |
| ---------------------------------------------- | * | |
| | * | |
| William S. Meeks, Trustee, | * | |
| | * | Appeal from the United States |
| Plaintiff - Appellee, | * | District Court for the |
| | * | Eastern District of Arkansas. |
| v. | * | |
| | * | |
| Red River Entertainment of Shreveport, | * | |
| Partnership In Commendam, doing | * | |
| business as Harrah's Shreveport Casino, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted:  November 15, 2001

Filed:  April 15, 2002

_____

Before WOLLMAN,[1] Chief Judge, JOHN R. GIBSON and FAGG, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

_____

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United State Court of Appeals for the Eighth Circuit at the close of business on January 31, 2002.  He has been succeeded by the Honorable David R. Hansen.

The bankruptcy trustee in the involuntary bankruptcy of Murray Armstrong brought this adversary proceeding against Red River Entertainment of Shreveport, operator of the Harrah's casino in Shreveport, Louisiana, to recover money Armstrong transferred to the casino to pay gambling debts within the year preceding his bankruptcy. The bankruptcy court found that Harrah's had established that it acted in good faith in receiving the transfers, but the district court[2] reversed that finding as clearly erroneous and remanded for entry of judgment for the trustee. On appeal, Harrah's contends that the bankruptcy court's finding of good faith was not clearly erroneous. We affirm the judgment of the district court.

Murray Armstrong was a lawyer who practiced in the small Arkansas towns of Star City and Rison. Beginning in 1990, Armstrong operated a Ponzi scheme[3] using fake timber contracts. As Armstrong's Ponzi debts grew into the millions of dollars, Armstrong resorted to other strategies to find the money to pay the debts. He kited checks, embezzled funds from elderly clients, and gambled. His misdeeds were exposed in 1996. An involuntary bankruptcy petition was filed against him on January 30, 1996. He pleaded guilty to thirty counts of taking unauthorized control of the property of another, and he is currently serving a 156-year prison sentence.

Beginning on May 5, 1995, Harrah's granted Armstrong a credit line allowing him to sign markers in exchange for gambling chips. Armstrong could redeem the markers by cash or check, he could turn in the chips he bought with the marker, or he could allow Harrah's to present the markers as a negotiable instrument drawn on his

_____

[2]The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

[3]In a Ponzi scheme, the operator promises investors returns on their investment which the operator intends to pay from funds provided by new investors, rather than from profits generated by the underlying business venture. See In re Hedged-Investments Assocs., Inc., 48 F.3d 470, 471 n.2 (10th Cir. 1995).

bank account. Armstrong's line of credit began at $15,000 on May 5, and was gradually increased in increments of $5,000 or $10,000, or more, until it reached $100,000 on August 12, 1995. In 1995, Armstrong lost a net $211,400 at Harrah's. The amount of transfers Armstrong made to Harrah's in payment of markers is reported variously as $357,000 or $377,000.[4]

Louisiana gaming regulations require a gambling licensee, such as Harrah's, to maintain an internal control system under which "credit may be extended only in a commercially reasonable manner considering the assets, liabilities, prior payment history and income of the patron." Louisiana Gaming Regulation § 42:XIII.2715(K) (emphases added).

At the time it opened Armstrong's line of credit for $15,000, Harrah's obtained a credit application and a gaming report, which included information on the status of other casino accounts Armstrong had established and on his bank balance. The credit application itself stated Armstrong's name, address, and social security number. It stated that he was a lawyer and owned his firm. Harrah's records of its investigation before opening the credit line show that another casino reported that Armstrong "carrie[d] a M5 in Bank," meaning that he had between $40,000 and $60,000 in the bank. Harrah's also had records showing that Armstrong had spent $41,900 at its casino in 1994. Harrah's comptroller testified that Harrah's did not know and did not inquire about the amount of Armstrong's income, assets or liabilities.

---

[4]The bankruptcy court reported the amount as $377,000, which was the amount pleaded in the complaint. The district court stated the figure as $357,000, which corresponds to the total amount cited by Harrah's, consisting of $189,000 in markers that were drawn directly from Armstrong's bank account and $168,000 in markers that Armstrong redeemed by checks, cashier's checks and cash. The Trustee contends that the district court's finding of $357,000 in transfers is the result of the Trustee's inadvertent use of the wrong figure. If so, the Trustee should seek relief from the district court.

Within three days of Armstrong's opening the credit line, Harrah's obtained a TRW credit report on Armstrong. The actual credit report from that time is not in the record before us. Testimony from Harrah's comptroller indicates that it would have been shredded when Harrah's obtained a more recent report. A TRW credit report on Armstrong dated October 1995 shows information on debts, including satisfactory payment history on a number of accounts, as well as the existence of a federal tax lien. Harrah's records show it learned of the tax lien on May 8.

Throughout the spring and summer, as Armstrong's credit authorization inched up to $100,000, Harrah's checked on his bank balance three more times. On June 26, Harrah's recorded that Armstrong had somewhere between $4,000 and $6,000 in the bank. On July 17, he had an actual balance of between $1,000 and $3,000, with an average balance of $4,000 to $6,000. On July 31, his account was reported "good for" $1500.

Other entries in Harrah's records reveal no further evidence of assets or income to support the grant of credit, but do show warning signs about Armstrong's financial condition. On July 15, Harrah's records were annotated: "Took Murray to $50,000 based on bank info and level of play." The bank information at that time indicated Armstrong had between $4,000 and $6,000 in his account. On August 11, Harrah's raised Armstrong's limit from $75,000 to $100,000. Harrah's records show a notation in Armstrong's credit file dated August 23, 1995: "Mr. Armstrong had his friend (Stephen Lovett) apply for credit so that he could use the money. We appear to have Mr. Armstrong in over his head. I strongly suggest no more increases." On the weekend of August 25 to 27, Armstrong spent $16,800 in cash and was issued $126,000 in markers at Harrah's. By this time, Harrah's was holding Armstrong's markers for two weeks before presenting them for payment at his bank. When Harrah's finally presented the markers for payment at Armstrong's bank, the bank returned $28,000 of the $100,000. The markers were returned on September 13 and 19, and Harrah's suspended Armstrong's credit line on September 13. Armstrong

redeemed those markers with checks that cleared, and returned to gamble with $9,000 cash on September 29.

Harrah's records on Armstrong listed his bank account as Bank of Rison Account Number 226815. Armstrong's credit application authorized Harrah's to investigate his credit records. In fact, Armstrong's account at the Bank of Rison had a negative balance on May 5, the day Armstrong first applied for credit with Harrah's, and it was overdrawn four times that May.

In January 1996, Armstrong's schemes were exposed, and his creditors filed an involuntary bankruptcy petition against him. The trustee filed an adversary proceeding against Harrah's, seeking to recover the moneys Armstrong had paid Harrah's in satisfaction of markers. The trustee pleaded that the transfers were fraudulent because Armstrong made them with actual intent to hinder, delay, or defraud his creditors, 11 U.S.C. § 548(a)(1), or because Armstrong received less than a reasonably equivalent value in exchange for the funds and was insolvent at the time of the transfers, 11 U.S.C. § 548(a)(2).

The bankruptcy court found that Armstrong did transfer the money with actual intent to hinder, delay, or defraud, and thus the trustee made a case for avoidance of the transfers. Meeks v. Red River Entertainment (In re Armstrong), 231 B.R. 739, 743 (Bankr. E.D. Ark. 1999). However, the bankruptcy court further found that Harrah's had established the defense available under 11 U.S.C. § 548(c), that it took the money for value and in good faith. Specifically, the bankruptcy court found: "[W]ith regard to the particular transactions at issue, Harrah's did not have reason to know of Armstrong's financial difficulties and insolvency." Id. at 744-45.

The district court reversed the bankruptcy court's finding on the good faith issue as clearly erroneous. Meeks v. Red River Entertainment (In re Armstrong), 259 B.R. 338 (E.D. Ark. 2001). The district court reviewed the evidence from Harrah's

comptroller that Harrah's did not ascertain the extent and value of Armstrong's assets, liabilities, or income when it first extended him credit or when it increased his credit line to $100,000. Id. at 343-44. The court also recounted that soon after approving Armstrong's initial credit application, Harrah's learned that there was a federal tax lien against Armstrong; that Armstrong had caused his friend to apply for credit so that Armstrong could gamble with the proceeds; and that Armstrong's bank balance had declined from the initially reported $40,000 to $60,000 level and was now reported as being "good for" $1,500. Id. at 343. The court also found significant the notation in Harrah's files on August 23, 1995, "We appear to have Mr. Armstrong in over his head." Id. at 344. The court concluded from these facts that Harrah's had sufficient knowledge to put it on inquiry notice that Armstrong might be insolvent. Therefore, Harrah's could not be said to have carried its burden of proving that it received the transfers in good faith. Id.

On appeal, Harrah's contends that it proved it had no reason to suspect Armstrong was insolvent.

We review the bankruptcy's court's ruling under the same standard of review as the district court: we review the legal conclusions de novo and the factual findings for clear error. Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1353 (8th Cir. 1995).

We examined the meaning of "good faith" under 11 U.S.C. § 548(c) in Brown, where we asked whether the transferees knew or should have known of the debtor's "possible insolvency" :

> The Bankruptcy Code does not define good faith. Good faith is not susceptible of precise definition and is determined on a case-by-case basis. To determine whether a transferee acts in good faith, courts look to what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective

standpoint. In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency.

67 F.3d at 1355 (emphasis added and internal citations and quotation marks omitted).

A finding of good faith is primarily a factual determination, which we therefore review for clear error. See id. Harrah's has the burden of proving good faith. Jobin v. McKay (In re M & L Bus. Mach. Co.), 84 F.3d 1330, 1338 (10th Cir. 1996).

Harrah's contends that it carried out an investigation sufficient to satisfy the Louisiana gaming law before it allowed Armstrong to participate in the marker system, and that this compliance establishes its good faith. Specifically, Harrah's contends that it possessed information that Armstrong spent $41,900 in cash at Harrah's during 1994. It also contends that it relied on the TRW report and on the Central Credit gaming report, which indicated that Armstrong had participated in the marker system at another casino and had no outstanding balances at the time he applied for credit. The Central Credit gaming report also included information on Armstrong's bank balance. Harrah's also had the information that Armstrong was a self-employed attorney in Star City, Arkansas.

Harrah's reliance on Armstrong's 1994 gambling history at Harrah's to establish his creditworthiness is dubious. Before opening Armstrong's credit account, Harrah's knew that Armstrong had spent $41,900 cash at its casino in 1994. Harrah's records appear to indicate that Armstrong had a net loss of $14,800 to show for these transactions. This information does not apprise Harrah's of Armstrong's assets, debts, income, or credit payment history, except to show he was almost $15,000 the poorer for his visits to the casino. Information that a person has recently gambled away large amounts of money is not an indication of financial stability.

Harrah's brief contends that the TRW credit report was crucial to its decision. Harrah's comptroller discussed the TRW report in his testimony; from what we can glean from his testimony and from a later version of the report, the TRW listed only debts, not assets or income. The comptroller indicated that Harrah's concluded Armstrong had certain kinds of assets because of the kind of debts he had. The comptroller said, "[H]e wouldn't have a real estate balance [on a loan] if he didn't have real estate." However, Harrah's had no idea what the collateral was, what it was worth, or whether Armstrong had net equity in the hypothetical collateral. The TRW report also showed Armstrong had a federal tax lien against him, but the October 1995 report before us shows a satisfactory payment history on other debts.

Harrah's proffered bank information is also problematic. It shows that Armstrong started with a $40,000 to $60,000 balance, which rapidly dwindled to $1,000 to $3,000, and eventually was reported as "good for" $1500, just as Harrah's was increasing Armstrong's credit limit by $5,000, $10,000 or more several times a month, and as Armstrong was taking advantage of that credit to lose hundreds of thousands of dollars gambling. The trustee introduced Armstrong's bank statement showing that Armstrong actually had a negative balance on May 5, the date he first applied for credit at Harrah's, and that his balance never rose above $11,100 in that month period. In his credit application, Armstrong authorized Harrah's to "conduct such investigations [pertaining to his credit] as it deems necessary for the approval" of his credit application. The president of the bank where Armstrong maintained his account testified that with this authorization he "probably" would have shared information about Armstrong's account with the casino, if the casino had asked. Harrah's explains why it ignored the low bank balances reflected in the bank reports it collected by saying that Armstrong could have had his assets in investments with a better return than a bank account. This argument would be more persuasive if Harrah's had introduced evidence that it knew of other assets. Instead, its comptroller testified that Harrah's did not know what assets, income or liabilities Armstrong had, and that Harrah's does not customarily ask patrons for such information. Armstrong

-8-

himself testified that no one at Harrah's asked him about his annual income or his assets when he applied for credit. Moreover, Harrah's itself pointed out that the markers were drawn on Armstrong's Bank of Rison account and that the markers said, "I represent that I have received cash for the above amount and that said amount is on deposit in said institution, in my name and is free from claims and subject to this check." Thus, Harrah's required Armstrong to sign markers representing that he had sufficient funds in the bank to cover the markers. This representation is in conflict with the comptroller's statements that he would not expect patrons to have money in the bank in the amount of their markers, and it seems to fly in the face of information Harrah's had about the state of Armstrong's bank account.

Harrah's also contends that it relied on the fact that Armstrong was a lawyer. The trustee introduced evidence that Armstrong's net income from his two law offices was $26,142.28 in 1994 and $9,919.24 in 1995, compared with his net 1995 gambling losses of $211,400 at Harrah's alone. An accountant expert testified at trial that for Armstrong to have funded his $211,400 loss would have required $348,962 in pre-tax income. Harrah's comptroller said he had no information at his disposal about the average income of lawyers in an Arkansas town with a population of less than 1500. The comptroller said Harrah's had no way to verify a patron's income. While questioning the comptroller on redirect, Harrah's counsel referred to the suggestion that Harrah's could have done more to ascertain Armstrong's income before lending him money. The comptroller responded that, while Harrah's did not talk to Armstrong's Sunday school teachers or review his report cards, it considered the amount of Armstrong's assets, liabilities, prior payment history and income in a "reasonable manner" consistent with industry practices. In fact, the evidence showed that Harrah's refused, for business reasons, to take such simple measures as asking the credit applicant about his income or assets. When the trustee's counsel inquired if Harrah's asked for evidence of annual income, such as income tax returns, the comptroller replied, "[W]e would be out of business the next day, sir."

During questioning, the President of the Bank of Rison, where Armstrong banked, agreed that he would not have lent Armstrong "a penny," let alone $100,000, without security in July, August and September of 1995.

In sum, Harrah's cannot be said to have proved that it extended credit "in a commercially reasonable manner considering the <u>assets</u>, liabilities . . . and <u>income</u> of the patron" in accordance with the Louisiana gaming regulations. Sec. 42: XIII.2715(K) (emphases added). To the contrary, the evidence established that Harrah's declined, for business reasons, to ask patrons for the kind of information mentioned in the gaming regulations.

Additionally, Harrah's was in actual possession of information that should have warned it that Armstrong was in financial straits. Harrah's became aware in May that Armstrong had a federal tax lien against him, yet there is no evidence that it investigated the circumstances of the lien. Harrah's records indicate that on August 23, it knew Armstrong had caused his friend Stephen Lovett to apply for credit so that Armstrong could use the proceeds. Harrah's employee annotated Armstrong's file with the note: "We appear to have Mr. Armstrong in over his head." Harrah's records indicate that two days after this entry, Armstrong returned to the casino and was issued $126,000 in markers over a two-day period.

On this record, we conclude without hesitation that Harrah's did not successfully discharge its burden of proving its own good faith. The bankruptcy

court's finding of good faith is clearly erroneous.  We affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.